[No. 29997. *En Banc.* June 16, 1947.]

THE STATE OF WASHINGTON, *on the Relation of Public Utility District No. 1 of Skagit County, Respondent,* v. JOHN WYLIE, *as Secretary of the Commission of Public Utility District No. 1 of Skagit County, et al., Appellants.*[1]

[1]Reported in 182 P. (2d) 706.

*Brodie & Brodie,* for appellant Wylie.

*W. E. Heidinger, Oliver Malm,* and *Metzger, Blair, Gardner & Boldt,* for appellant Weyerhaeuser Timber Company.

*Weter, Roberts & Shefelman, Victor D. Lawrence, Norman G. Booth, McCutcheon & Rowland,* and *Warren J. Gilbert (Wood, Hoffman, King & Dawson,* of counsel), for respondent.

*The Attorney General, Frederick J. Lordan* and *Smithmoore P. Myers, Assistants, A. C. Van Soelen, J. Ambler Newton, Clarence J. Coleman,* and *George F. Yantis, amici curiae.*

HILL, J.—This cause is before this court on an appeal from the superior court of Skagit county, which, on May 10, 1946, entered an order directing the issuance of a peremptory writ of mandate directed to the appellant, John Wylie, as secretary of the commission of public utility district No. 1 of Skagit county, Washington, commanding him, as such secretary, to attest and affix the seal of said district to electric revenue bonds in the aggregate principal amount of one hundred thirty-five million dollars, and like-

wise commanding him, as such secretary, to attest and affix the seal of said district to certain contracts with nine other public utility districts.

Public utility district No. 1 of Skagit county, Washington, comprises all of Skagit county and was organized under the public utility district law (Laws of 1931, chapter 1, p. 3), and will hereinafter be referred to as the "Skagit district."

The Skagit district seeks to issue revenue bonds in the sum of one hundred thirty-five million dollars, for the purchase of certain properties of the Puget Sound Power & Light Company, a Massachusetts corporation, which company will hereinafter be referred to as "Puget Sound." These properties include all of Puget Sound's facilities for generating, transmitting, and distributing electric current, together with certain facilities that are used, in part, for the production, distribution, and sale of steam for heating purposes in a portion of the central business district in the city of Seattle. It is conceded that the amount of one hundred thirty-five million dollars, required for the purchase of the Puget Sound properties, was arrived at by adding the following items, all computed as of October 31, 1945:

"(1) A net liquidating dividend of $18.00 per share for each of the 2,177,879 shares of common stock now outstanding .................................. $39,201,822.00

(2) An amount equal to $110.00 per share for each of the 137,500 shares of preferred stock of the company now outstanding (exclusive of accrued dividends thereof to date of redemption) being the price required to be paid when such stock is called for redemption prior to maturity................ 15,125,000.00

(3) An amount equal to $1,042.50 for each of the 4¼% mortgage bonds of the company now outstanding (exclusive of accrued interest to date of redemption at the rate of 4¼% per annum), being the price required to be paid when such bonds are called for redemption prior to maturity......... 53,662,688.00

(4) An amount equal to the face amount of serial 3⅛% notes of the company now outstanding (exclusive of accrued interest to date of redemption), being the price required to be paid when such notes are called for redemption prior to maturity.. 2,812,500.00

(5) An amount equal to the accrued interest on debt obligations and accrued dividends and premiums on mortgage bonds, preferred stock and notes.... 1,268,812.00

$112,070,872.00

The total determined and unascertained liabilities of the Company including expenses incident to the dissolution of the Company, ad valorem taxes, federal income and excess profit taxes............ $6,857,700

Net current assets including cash on hand, materials and supplies, accounts receivable, prepayments, unbilled revenues and estimated receipts from sale of non-electric properties .............................. 6,759,000    98,700.00

$112,169,572.00

Reserve for possible capital gains tax or for capital improvements to the properties....$15,723,200

Bond discount ......................... 1,400,000

Working capital ....................... 5,245,228

Payment to Fiscal Agent................ 262,000

Contingent dissolution expense, and contingent liability to stockholders.............. 200,000   22,830,428.00

$135,000,000.00"

(In addition to the two hundred sixty-two thousand dollars of revenue bonds to be issued for payment of the fiscal agent, the Skagit district is to issue up to one million forty-eight thousand dollars in certificates of indebtedness to him, as the remainder of his compensation, making a total maximum compensation for him of one million three hundred ten thousand dollars.)

The properties of Puget Sound are located in eighteen counties of the state, to wit: Whatcom, Skagit, Snohomish, Island, King, Pierce, Kitsap, Jefferson, Mason, Grays Harbor, Thurston, Cowlitz, Lewis, Pacific, Chelan, Kittitas, Grant, and Douglas. Public utility districts have been organized and exist in all of these counties except King, Pierce, and Island.

For the purposes of this purchase, the Puget Sound properties have been classified as "production" and "distribution." The production properties include the following generating plants:

|  | Demonstrated Capability in Kilowatts |
|---|---|
| White River (hydroelectric) | 63,000 |
| Snoqualmie Falls (hydroelectric) | 21,000 |
| Shuffleton (steam) | 85,000 |
| Electron (hydroelectric) | 23,000 |
| Baker River (hydroelectric) | 41,100 |
| Rock Island (hydroelectric) | 80,000 |
| Tumwater (hydroelectric) | 5,250 |
| *Georgetown (steam) | |
| | 318,350 |

*(The Georgetown steam plant is regarded as standby equipment and is kept in cold reserve. It has a nominal capacity of 23,000 kilowatts.)

The production properties also include most of the transmission lines and all or part of forty substations and other miscellaneous properties, as set forth in exhibit No. 32. They are all to be operated and managed by the production division as though they comprised a separate and distinct business enterprise. The portion of the one hundred thirty-five million dollar purchase price allocated to these properties is sixty million eight hundred ninety-seven thousand dollars.

The distribution properties include the following hydroelectric generating plants: Nooksack, Leavenworth, Dryden, Entiat, Olympia, and Kalama, and the Chehalis steam electric generating plant. (These are plants of relatively small capacity, the largest having a demonstrated capability of 2,420 kilowatts.) The distribution properties also include some transmission lines, all or part of numerous substations, all of the distribution lines, and other miscellaneous property, as set forth in exhibit No. 33. The distribution properties are to be disposed of as follows:

(a) The Cowlitz, Lewis, Pacific No. 2, Whatcom, Chelan, Kitsap, Mason No. 3, Snohomish, and Thurston county public utility districts are to acquire the distribution properties within their respective districts. (Chelan will also acquire such properties within the Douglas and Grant county districts.) The terms of acquisition are set forth in contracts which were admitted as exhibits. (The four

districts first named will not purchase power from the Skagit district, but the other five will secure the major portion of their power requirements through the Skagit district.) The total of the purchase price to be paid by these districts to the Skagit district is twenty-nine million three thousand dollars.

(b)   The distribution properties in Grays Harbor, Jefferson, Kittitas, Island, King, and Pierce counties are to be retained, for the time being, at least, by the Skagit district. (The first three named have public utility districts, and it apparently was contemplated that these districts would acquire the distribution systems within their respective limits, but, at the time of the trial in the superior court, they had not contracted so to do.  There are no public utility districts in the three counties last named, and they constitute what is referred to, in the testimony and briefs, as the "unorganized territory."  King county is divided into two segments, one inside and one outside the area in which Puget Sound and Seattle City Light are competitors.)  In all of these counties, the Skagit district will be engaged in selling electric energy at retail, and the distribution system in this group of counties will be operated and managed as though it were a separate and distinct business enterprise.  It will be known as the "outside subdivision" of the distribution division.  The amount of the purchase price allocated to the distribution system in these counties is forty-two million three hundred seventy thousand dollars.

(c)   The distribution properties within the territorial limits of the Skagit district will also be operated and managed as though they constituted a separate and distinct business enterprise, and will be known as the "Skagit subdivision" of the distribution division.  The portion of the purchase price allocated to the distribution properties in Skagit district is two million seven hundred thirty thousand dollars.

Summarizing, we have the following allocation of the one hundred thirty-five million dollar purchase price:

|  | Amount | *Percentage of* *Total Price* |
|---|---|---|
| Production properties ................... | $60,897,000 | 45.109% |
| Distribution properties: |  |  |
| (a) To be acquired by various districts.. | 29,003,000 | 21.484 |
| (b) Outside of Skagit district but to be retained and operated by it........ | 42,370,000 | 31.385 |
| (c) Within Skagit district.............. | 2,730,000 | 2.022 |
|  | $135,000,000 | 100.000% |

Skagit district has also, within its territorial limits, the Baker river hydroelectric plant, which is one of six major generating plants included in the "Production properties" above, and represents 12.9% of the demonstrated capability, in kilowatts, of those properties. There is no segregation in the record of the values attached to the production properties, so there is no evidence from which it can be accurately determined what percentage of the purchase price could properly be allocated to the production properties within Skagit district.

It is proposed that one hundred thirty-five million dollars of revenue bonds be sold to make funds available for the purchase of the Puget Sound properties. By order of the superior court of Skagit county, herein appealed from, the appellant John Wylie, as secretary of the Skagit district, is directed to sign these revenue bonds and the various contracts with the other nine public utility districts.

This does not purport to be a detailed statement of the plan whereby Skagit district is to acquire all of the electric properties of Puget Sound and to operate the major portion of them, or of the contractual relations with the other nine districts whose contracts are here involved, but it gives a brief resume of what is proposed, and sufficient background for discussion of the questions here presented.

Many issues are raised by the appellants and the various *amici curiae.* Basically, it first must be determined whether or not the Skagit district has a right to acquire all the properties of Puget Sound under the circumstances here existing and to engage in the generation, transmission, distribution, and sale of electric energy, on the scale here contemplated. Unless it is determined to have that right,

the other questions posed in the various briefs are academic.

It may be conceded that this very ingenious and carefully devised plan gives to the various public utility districts concerned other than Skagit, the opportunity to acquire properties which they desire, at considerable savings over any awards that might be made if they were to endeavor to condemn such properties. It may also be conceded that Puget Sound's repeated objections to piecemeal acquisition are thereby obviated.

Emphasis is placed upon the fact that all of the electric properties of Puget Sound must be acquired, because it is an integrated system. The principal witness, R. W. Beck, an engineer employed by John Nuveen & Company, which concern, with its associates, has a contract to purchase the bonds, testified:

"In other words, this whole vast system extending over the eighteen counties is operated as one unit, and has been built up to that point over a number of years by the company in order to get the most efficient operations, and the lowest cost of delivering energy to the consumers.

"There is only one point in which there is no integration with the main system, and that is the small Point Roberts system which, as you may know, is a small piece of land which extends into Canada and is not connected with the United States at all, and in order to serve the people in the Point Roberts community energy is purchased from the B. C. Electric Railway Company and delivered to the people that way. But in all other respects the Puget Sound system is a completely integrated system operating as one system, just operating together that way."

On cross-examination, he was questioned as to why the Baker river hydroelectric generating plant, located in Skagit county and having a capability of 41,100 kilowatts (or 360,036,000 kilowatt-hours in one year), was not adequate to supply Skagit county's needs (the consumption in that county having been 71,511,955 kilowatt-hours in 1944). In response to the question, "Is Skagit County and the customers within Skagit, are they served from the Baker River plant?" he answered:

"No, they are served from the integrated system of the company. You must appreciate that all of the power plants

are tied together by transmission lines in order to enable the company to get the maximum economy out of the use of all of those plants. Those plants are all tied together and operate and function as a unit. Where the kilowatt hours come from, or the electricity comes from at any time cannot be determined with any finality. It is just all one big pot and there is a spigot in the pot that leaves some kilowatt hours in Skagit County."

He was also asked, "What would be the necessity of Skagit County taking over the Rock Island plant?" to which he replied:

"Because it is part of the integrated system. The Rock Island plant's maximum production occurs when there is a minimum stream flow, and that usually occurs at the same time of the year when there is minimum output in the Baker plant, so that the Rock Island plant and the Baker River plant tied in together enables them to get the maximum amount of firm power out of both plants. When Baker River's production falls off due to freezing in the winter is exactly the time Rock Island is having its maximum production because it has low stream flow."

At this point, we might well take a look at the extent of this integrated system. We have already indicated its extent from the standpoint of production and have enumerated the generating plants and their capabilities. The figures for the year 1944, which follow, give the number of customers, their consumption of electric energy in kilowatt-hours, and Puget Sound's Revenues from the eighteen counties in which the company operates.

| | Puget Sound Customers 1944 | K.W.H. Sold by Puget Sound in 1944 | Puget Sound's Revenues 1944 |
|---|---|---|---|
| Areas in which public utility districts are to acquire distribution properties but will not purchase power from Skagit: | | | |
| Cowlitz ................... | 5,138 | 11,792,211 | $248,515 |
| Lewis ................... | 6,743 | 19,912,540 | 383,403 |
| Pacific ................... | 181 | 231,941 | 5,939 |
| Whatcom ................ | 19,303 | 99,999,948 | 1,310,501 |
| Total ................ | 31,365 | 131,936,640 | $1,948,358 |

| | Puget Sound Customers 1944 | K.W.H. Sold by Puget Sound in 1944 | Puget Sound's Revenues 1944 |
|---|---|---|---|
| Areas in which public utility districts are to acquire distribution properties and will purchase power from Skagit: | | | |
| Chelan (Douglas and Grant) | 9,760 | 70,987,870 | $964,667 |
| Kitsap ................... | 24,078 | 128,961,863 | 1,874,873 |
| Mason (to get power from Kitsap) .............. | 741 | 1,028,004 | 24,673 |
| Snohomish ............... | 31,281 | 187,650,787 | 2,193,839 |
| Thurston ................ | 12,833 | 46,512,278 | 830,220 |
| Total ............... | 78,693 | 435,140,802 | $5,888,272 |
| Areas in which public utility districts are organized but which have not agreed to acquire the distribution property, and where Skagit will sell power at retail: | | | |
| Grays Harbor ............ | 3,076 | 7,125,669 | $141,707 |
| Jefferson ................ | 2,463 | 16,190,313˙ | 194,022 |
| Kittitas .................. | 1,668 | 17,862,931 | 184,934 |
| Total ................ | 7,207 | 41,178,913 | $520,663 |
| Areas in which no public utility districts exist and where Skagit will sell power at retail: | | | |
| Island ................... | 2,623 | 18,382,460 | $227,913 |
| King: Outside of Seattle competitive area .. | 33,108 | 139,737,120 | 2,188,331 |
| Within Seattle competitive area ...... | 63,470 | 525,467,792 | 7,421,649* |
| Pierce .................. | 12,288 | 51,197,639 | 750,570 |
| Total ................ | 111,489 | 734,785,011 | $10,588,463 |
| Skagit district ........... | 12,027 | 71,511,955 | $870,820 |

*Includes $769,255 steam heat revenues.

A summary of the foregoing figures as to areas, follows:

## SUMMATION

| | Customers | Per Cent of Total | K.W.H. Sold by Puget Sound in 1944 | Per Cent of Total | 1944 Revenues | Per Cent of Total |
|---|---|---|---|---|---|---|
| Areas in which public utility districts are to acquire distribution properties but will not purchase power from Skagit .......................... | 31,365 | 13.026% | 131,936,640 | 9.327% | $1,948,358 | 9.832% |
| Areas in which public utility districts are to acquire distribution properties and will purchase power from Skagit .................. | 78,693 | 32.682 | 435,140,802 | 30.762 | 5,888,272 | 29.714 |
| Areas in which public utility districts are organized but which have not agreed to acquire the distribution property, and where Skagit will sell power at retail.............. | 7,207 | 2.993 | 41,178,913 | 2.911 | 520,663 | 2.627 |
| Areas in which no public utility districts exist and where Skagit will sell power at retail.................. | 111,489 | 46.303 | 734,785,011 | 51.945 | 10,588,463 | 53.432 |
| Sub-total ................ | 228,754 | 95.005 | 1,343,041,366 | 94.945 | 18,945,756 | 95.606 |
| Skagit district ......... | 12,027 | 4.995 | 71,511,955 | 5.055 | 870,820 | 4.394 |
| Total .................... | 240,781 | 100.000% | 1,414,553,321 | 100.000% | $19,816,576 | 100.000% |

Recognizing all the values and advantages of the acquisition of this integrated system, we must now come to grips with the question: Where does the Skagit district get power and authority to purchase "this whole vast system extending over eighteen counties"? Merely because a plan is new or the methods proposed novel and unprecedented, is no reason to condemn it; nor is it to be regarded with disfavor merely because, as respondent's witness Malcolm Prosser testified, "the setup is involved and intricate," or, as the witness Albert O. Foster said, "replete with complex factors." As respondent aptly points out, the advisability or lack of it in any such plan is, likewise, none of our concern. We are, however, as previously indicated, concerned with the question of the power and authority of the Skagit district to proceed with the contemplated purchase.

Respondent contends that the right to purchase the integrated system owned by Puget Sound is found in Rem. Rev. Stat., § 11610 [P.P.C. § 833-11] (d) (Laws of 1931, chapter 1, p. 12, § 6(d)):

"(d) To purchase, *within or without its limits,* electric current *for sale and distribution within or without its limits,* and to construct, condemn and purchase, purchase, acquire, add to, maintain, conduct and operate works, plants, transmission and distribution lines and facilities for generating electric current, operated either by water power, steam or other methods, *within or without its limits,* for the purpose of furnishing said public utility district, and the inhabitants thereof and any other person, including public and private corporations, *within or without its limits,* with electric current for all uses . . ." (Italics respondent's.)

Respondent urges that the words "within or without its limits" are clear and unambiguous and afford no basis for judicial construction.

To carry respondent's argument to its logical conclusion, means that the Skagit district not only could acquire the properties of Puget Sound, but it could acquire those of the Washington Water Power Company and the Pacific Power & Light Company serving the great industrial, min-

ing, and agricultural areas of eastern Washington. By the same token, a public utility district in Pend Oreille county, in the northeastern corner of the state, could acquire the Puget Sound properties. This holding, however, is not based on an hypothesis of any such extreme situation, and for our present purposes we limit ourselves to the factual situation actually presented: *i.e.*, a portion of the distribution and production properties of Puget Sound is within the territorial limits of the Skagit district, which seeks to acquire all the distribution and production properties of the company, both within and without its limits.

Respondent, to buttress its position, directs attention to the purposes and objects of the public utility district law of 1931, chapter 1, p. 3, as stated in the first section:

" . . . to authorize the establishment of public utility districts to conserve the water and power resources of the *State of Washington* for the benefit of the *people thereof,* and to supply public utility service, including water and electricity for all uses." (Italics respondent's.)

Respondent's brief states on p. 17 thereof:

"The words, *'people thereof,'* obviously refer to the *people of the State of Washington* and not to the residents of any one district alone. This is not only apparent from the language above quoted, but becomes obvious from an examination of Section 6 of the act, wherein the powers of the districts are enumerated." (Italics respondent's.)

Respondent then quotes subsections (a) and (d) of Rem. Rev. Stat., § 11610. We have already quoted (d); (a) reads as follows:

"(a) To make a survey of hydro-electric power, irrigation and domestic water supply resources *within or without the district,* and to compile comprehensive maps and plans showing the territory that can be most economically served by the various resources and utilities, the natural order in which they should be developed, *and how they may be joined and co-ordinated to make a complete and systematic whole;* . . ." (Italics respondent's.)

The brief then continues:

"This power is granted to *all* public utility districts, any one of which may exercise them to the fullest extent, and

manifests an intent on the part of the voters who initiated the measure that the residents of all counties, whether or not so fortunately situated as to enjoy power resources within their boundaries, should share equally in the benefits conferred by the law." (Italics respondent's.)

With this argument we shall deal at some length, because it is the foundation of the legal structure here presented.

After a careful and detailed analysis of the public utility district law itself, we are convinced that the construction given the words "without the district" and "without its limits" by the respondent, is too broad; and that, when read in connection with the context of the act of which they are a part and when considered in the light of the avowed purpose of its sponsors and its legislative history, these words should not be carried beyond the express holding in *Carstens v. Public Utility Dist. No. 1*, 8 Wn. (2d) 136, 111 P. (2d) 583; and that subsection (d) should be construed to mean that the primary purpose of the public utility district is to furnish the district, and the inhabitants thereof, with electric current, and that the furnishing of electric current to any other person, including public and private corporations, within or without its limits, is an incidental purpose only.

One alternative plan proposed by respondent for taking over the assets of Puget Sound is that the Skagit district shall acquire at least two thirds of the corporate stock of Puget Sound and then proceed with its dissolution.

We have a provision in our state constitution which reads:

"No . . . municipal corporation shall hereafter . . . become directly or indirectly the owner of any stock in or bonds of any association, company, or corporation." (Art. VIII, § 7.)

This language would seem to be clear and unambiguous, and not subject to construction.

The respondent contends, and cites abundant authority to support its contention, that such a constitutional mandate, however clear and unambiguous, does not prevent a municipality from acquiring the stock ownership of a cor-

poration as a convenient means of acquiring its assets. The cases relied upon by respondent point out that a constitutional provision is to be construed with reference to the evils it was intended to correct or prevent.

We mention this constitutional provision and the alternative plan, not for the purpose of passing upon the constitutional question which the alternative plan presents, but merely to make it evident that respondent does not regard judicial construction as forbidden even where words are, in fact, clear and unambiguous.

■ It is a rule of statutory, as well as constitutional, construction that the antecedent mischief may be considered, also the history and circumstances of the legislative enactment. *Cherry Point Fish Co. v. Nelson,* 25 Wash. 558, 66 Pac. 55; *Huntworth v. Tanner,* 87 Wash. 670, 152 Pac. 523, Ann. Cas. 1917D, 676; *State ex rel. Troy v. Yelle,* 27 P. (2d) 99, 176 P. (2d) 459; *United States v. Union Pac. R. Co.,* 91 U. S. 72, 23 L. Ed. 224.

We turn now to the history of the act. It was filed in the office of the secretary of state on October 25, 1928, as initiative to the legislature No. 1. It was submitted to the legislature January 21, 1929, and rejected by it on February 1, 1929. It was passed by vote of the people at the general election of November 4, 1930, and the proclamation making it effective was signed by the governor on December 3, 1930. It appears as chapter 1, p. 3, Laws of 1931.

■ In determining the purpose and import of initiative measures, we may consider

". . . the common understanding of the purpose of the law, according to arguments supporting that view submitted by authority of law at the time the act was submitted to the people for their support at the general election." *Denny v. Wooster,* 175 Wash. 272, 27 P. (2d) 328.

We also said, in *Bayha v. Public Utility Dist. No. 1,* 2 Wn. (2d) 85, 97 P. (2d) 614:

"Rem. Rev. Stat., §§ 5422 to 5425 [P. C. §§ 2775 to 2778], provide for arguments for and against a proposed initiative measure, and the distribution of pamphlets containing such arguments to the voters prior to the election. Relators

introduced herein exhibit No. 14, which is a pamphlet containing arguments against the public utility act, and in such argument it was contended that the act gave the commission almost unlimited power to purchase, etc., the property of utility companies. We think it must be assumed, then, that the people, in voting on this initiative, did so believing that public utility districts had the broad powers claimed in such argument. We held in *Denny v. Wooster*, 175 Wash. 272, 27 P. (2d) 328, that arguments made in pamphlets for and against an initiative measure might be considered by the court in determining the purpose and intent of the act."

The public utility act referred to in that quotation is the one with which we are here concerned.

The pamphlet compiled and issued by the secretary of state prior to the general election of November 4, 1930 (which was exhibit No. 14 referred to in the foregoing quotation), contained an argument for the initiative signed "Executive Committee, Washington State Grange," and "James Taylor, President, Washington State Federation of Labor." The first paragraph is as follows:

"This measure, known as the District Power Bill, was initiated by more than 57,900 signatures of registered voters. Its purpose is to conserve the water and power resources of the state for all of the people, by authorizing the establishment of public utility districts comprising a county or less in area. The method of formation of these districts is the same as for port districts, and the *powers granted are the same as those now possessed by incorporated cities.*" (Italics ours.)

Again it says:

"This bill gives the people of *rural districts the same right to develop and distribute electricity that city dwellers now enjoy.*" (Italics ours.)

We quote, also, the concluding paragraph:

"This measure is necessarily rather long, but *the purpose is simple and clear.* It is based upon existing legislation which has stood the test of the courts and is in practical operation. It will save our water resources for the people. *It will give country districts the same access to our water resources that cities now have.* It will insure reasonable

rates, and gradually lower rates. Help yourselves and your children. Give the people of the rural districts a square deal. Vote for Initiative Measure No. 1." (Italics ours.)

To the same effect is a statement made years later, in June, 1942, by Judge, then Senator, Homer T. Bone, in the course of a joint hearing before the House and Senate sub-committees on the Columbia power administration bill:

"In 1929 I and one or two of my associates wrote a public power bill for the Washington State Grange. It has been a law referred to since as the Grange power law. Legally and technically it is known as the public-utility-district law. It authorized a county or a portion of a county to hold an election and, with the proper majority, go into the power business up to the hilt. . . . That power was as broad as the power given cities under the statutes."

It is obvious that the sponsors of this initiative had no intention of giving the public utility district powers which incorporated cities did not possess. It is likewise conceded that, if the contention of respondent be sustained, public utility districts do have powers vastly greater than those possessed by any incorporated city in the state, then or now.

In 1939, in the *Bayha* case, *supra,* resort was made to the arguments in the pamphlet issued by the secretary of state prior to the 1930 election, to aid in the construction of the statute. As we again review these arguments, it is apparent that there was a marked difference of opinion between the opponents and the proponents of the initiative, as to the powers of public utility districts under the initiative then before the people. In one of their arguments, the opponents of the measure stated:

"It would permit a public utility district in one county to acquire all the private electric systems in the other counties and to fix rates for current without any state control to insure fair and non-discriminatory rates and adequate service."

As we have pointed out, the proponents repeatedly stated or inferred that the powers were the same as those then possessed by incorporated cities.

If the proponents say that the powers of a public utility district are the same as those possessed by cities, and the opponents say that the powers are almost unlimited, and the people then approve and adopt the initiative, we cannot logically say that the people did not believe the proponents but adopted the measure because they believed the opponents and wanted it anyway. It was not our intention to take any such position when we said, in the quotation from the *Bayha* case, *supra*:

"We think it must be assumed, then, that the people, in voting on this initiative, did so believing that public utility districts had the broad powers claimed in such argument."

We were, in that case, when that language was used, passing on the specific question of whether or not an election is required as a prerequisite to the purchase of a privately owned utility by a public utility district. It had been pointed out in one of the briefs that the opponents of the initiative had argued that such a purchase could be made without a popular vote, and that the proponents had agreed. We, therefore, were discussing a proposition on which both sides had been in agreement at the time the initiative was submitted to the people.

We are here confronted with a problem of basic powers on which the opponents and the proponents were in marked disagreement. The proponents prevailed in the election, and, while no one can say why the people voted in a certain way on a certain measure, the argument is persuasive, if not conclusive, that the majority of the people had adopted the argument of the prevailing side. As Justice Mitchell said, in *Denny v. Wooster, supra*:

"Manifestly, the purposes and clear import of the act were and are to limit the amount of taxes to be levied in the future on real and personal property; to bring about necessary reductions in the cost of government; and to negative any thought whatever of repudiating present indebtedness represented by outstanding bonds and warrants. *Such was the common understanding of the purpose of the law, according to arguments supporting that view submitted by authority of law at the time the act was submitted to the*

*people for their support at the general election.*" (Italics ours.)

If, as its sponsors and coauthor state, it was their intention to give public utility districts the same rights that cities then had, we may profitably inquire as to what those rights were then understood to be.

The right of cities to acquire sources of water supply *without their limits,* even without the state itself, had been established. *Langdon v. Walla Walla,* 112 Wash. 446, 193 Pac. 1 (1920).

The right of a city to acquire an existing plant, even though it used only forty per cent of the supply, had been recognized, as had its right to sell the excess, or surplus supply, to any person within or without the city. However, the right to acquire, even by purchase, the means of distribution had or used by another city, had been denied. *Spear v. Bremerton,* 90 Wash. 507, 156 Pac. 825 (1916).

The right of a city, in acquiring a public utility plant, to acquire thereby property and facilities in excess of its strict present needs, and to dispose of its surplus beyond its corporate limits, had likewise been upheld. *Tacoma v. Nisqually Power Co.,* 57 Wash. 420, 107 Pac. 199 (1910); *Chandler v. Seattle,* 80 Wash. 154, 141 Pac. 331 (1914); *Jones v. Centralia,* 157 Wash. 194, 289 Pac. 3 (1930).

However, the following quotation from *Jones v. Centralia, supra,* indicated that there was a limit beyond which municipalities might not go, and that the courts would restrain the construction or acquisition of an unreasonably large plant, or one for any reason entirely inappropriate to the service for which it might lawfully be designed.

"Granting that, under the statutes of this state authorizing the construction by a municipality of a power plant and system, the courts would restrain the construction of an unreasonably large plant or one for any reason entirely inappropriate to the service for which it may lawfully be designed, we find no sufficient ground in the record for interfering with the judgment of the city authorities as exercised by them in connection with the proposed power plant, and, assuming, for the purposes of this opinion, that the testimony offered by appellant had been received, we

find therein no ground for reversing the judgment of the trial court."

The testimony offered and refused, to which the court referred, was to the effect that the proposed plant would yield power far in excess of the present needs of the city of Centralia.

We do not believe that anyone contends that in 1930 cities of any class had powers beyond those indicated; and, as a matter of fact, it required a decision of this court, in December of 1931, to clarify the question of the power of first- and second-class cities to sell beyond their limits. We refer to *Municipal League of Bremerton v. Tacoma,* 166 Wash. 82, 6 P. (2d) 587.

A public utility district coextensive with a county in its territorial limits would include cities of various sizes and classifications within its borders. Necessarily, the problems presented would require different statutory provisions from those pertaining to cities. We so recognized in *Carstens v. Public Utility Dist. No. 1,* 8 Wn. (2d) 136, 111 P. (2d) 583 (1941). Consequently, what we have said with reference to the powers of cities is important only in those situations where, as here, we are confronted with the question: What was the legislative intent?

The construction we have placed on the words "without its limits" makes the powers of public utility districts entirely consistent with those of cities as they had been established in 1930, and consistent with the good faith and honesty of purpose of the sponsors of the public utility district law.

Almost all of the counties of the state have organized public utility districts. There have been numerous condemnations under the act, and frequently the awards, particularly for severance damage, have been so high that the districts have refused to take the property. The results of piecemeal condemnation have brought criticism from both the public utility districts and the power companies. It seems, however, to have been generally agreed that additional legislation was necessary to permit the public utility districts, if consolidation as provided for in the act was not

practicable, to co-operate in taking over the facilities of one of the major power companies in its entirety, where that company operated in several counties. We find, for instance, in a report of the joint hearings of the House and Senate subcommittees on the Columbia power administration bill, June 3 to 19, 1942, that the proponents of that measure were stressing the necessity of the power given the Federal administration to issue revenue bonds, the proceeds of which could be used to buy the privately owned power systems in Washington and Oregon for the purpose of re-selling the distribution facilities to the interested public utility districts and cities.

Referendum No. 25, referred to in all briefs, provided for a "joint commission" which would have the power to take over a power company such as Puget Sound Power & Light Company, in its entirety, and then to sell the distribution systems to the various interested public utility districts. We quite agree with the respondent that no inferences are to be drawn from the vote in the various areas on that measure. The Columbia valley administration law and referendum No. 25 have significance here only because they indicate that those who were attempting to solve the problem of severance damages and multiplicity of suits inherent in piecemeal condemnation, seemed to believe that additional legislation, Federal or state, was necessary. This additional legislation was considered necessary in 1942 and in 1944, despite the fact that there had been the suggestion, in the case of *Carstens v. Public Utility Dist. No. 1, supra,* of the possible existence of the broad powers now contended for. The prevalence of such beliefs would indicate that those powers have not been regarded, heretofore, as clear, certain, and unambiguous.

We now turn our attention to a section-by-section analysis of the act, with comments on each section in which there is anything that casts light upon the object of our search: *i.e.,* the authority to carry out the plan proposed, and the evidence of intention with reference thereto.

In the portion of the respondent's brief quoted above,

considerable emphasis is placed on § 1, p. 3, of the act, which reads as follows:

"Section 1. The purpose of this act is to authorize the establishment of public utility districts to conserve the water and power resources of the State of Washington for the benefit of the people thereof, and to supply public utility service, including water and electricity for all uses." (Rem. Rev. Stat., § 11605 [P.P.C. § 833-1].)

and particularly on the words "water and power resources of the State of Washington for the benefit of the people thereof."

Section 2 (Rem. Rev. Stat., § 11606) implements the purpose by authorizing the establishment of municipal corporations to be known as public utility districts.

Section 3 (Rem. Rev. Stat., § 11607) provides that these districts may be coextensive with the boundaries of a county or may be an area less than an entire county, and sets forth the method of getting the formation of such a district on the ballot.

Sections 4 and 5 (Rem. Rev. Stat., §§ 11608, 11609) deal with elections, with the terms of public utility district commissioners, and with the local districts, within the public utility district, from which the commissioners are to be elected. These sections were amended in 1941 (Rem. Supp. 1941, §§ 11608, 11609) in certain particulars not material here.

Section 1 has to be construed with the sections that follow, and its sponsors say in the argument quoted:

"Its purpose is to conserve the water and power resources of the state for all of the people, by authorizing the establishment of public utility districts comprising a county or less in area."

As this excerpt from the sponsors' argument points out, the broad purpose is to be accomplished "by authorizing the establishment of public utility districts comprising a county or less in area," to be controlled by commissioners selected from districts created within the public utility district itself. There is nothing thus far in the act to indicate that there was any idea that one of these districts, com-

prising a county or less, was to generate electric energy for, and sell electric energy to, the entire state or a considerable part thereof. Such authority, if it exists, must be found in § 6 which, in fourteen subsections lettered (a) to (n), inclusive, sets forth the powers of the district. This section was amended in 1945, chapter 143, p. 402, § 1 (Rem. Supp. 1945, § 11610); however, subsection (m) is the only portion of the section affected by the amendment. All the pertinent subsections will be set forth.

"Sec. 6. All public utility districts organized under the provisions of this act shall have power:

"(a)   To make a survey of hydro-electric power, irrigation and domestic water supply resources within or without the district, and to compile comprehensive maps and plans showing the territory that can be most economically served by the various resources and utilities, the natural order in which they should be developed, and how they may be joined and co-ordinated to make a complete and systematic whole;  . . ." (Rem. Rev. Stat., § 11610(a))

It is recognized that hydroelectric power, irrigation, and domestic water supply resources required to serve any district may be without the district, and the provision for making a survey of these resources "within or without the district" is desirable and necessary. Respondent seems to argue, at p. 18 of its brief, that this subsection warrants any district in making a survey of all the hydroelectric power resources of the state in order that they may be joined and co-ordinated to make a complete and systematic whole.

The things that are to be joined and co-ordinated are the hydroelectric power, irrigation, and domestic water supply resources. It will be noted that the phrase "within or without the district," as here used, refers only to the various resources that are to be surveyed, and not to the "territory that can be most economically served." We would be compelled to write in another "within or without the district," thus making the subsection read, "showing the territory *within or without the district* that can be most economically served by the various resources and utilities," if we were

to give this provision the full scope for which respondent contends. It seems too clear for argument that the territory referred to is the territory within the public utility district.

"(b) To construct, condemn and purchase, purchase, acquire, lease, add to, maintain, operate, develop and regulate all lands, property, property rights, water, water rights, dams, ditches, flumes, aqueducts, pipes and pipe lines, water power, leases, easements, rights of way, franchises, plants, plant facilities and systems for generating electric energy by water power, steam or other methods, plant, plant facilities and systems for developing, conserving and distributing water for domestic use and irrigation, buildings, structures, poles and pole lines, and cables and conduits and any and all other facilities, and to exercise the right of eminent domain to effectuate the foregoing purposes or for the acquisition and damaging of the same or property of any kind appurtenant thereto, and for the purpose of acquiring the right to make physical connection with plants and plant facilities of any and all persons, corporations and municipalities . . ." (Rem. Rev. Stat., § 11610(b))

This subsection further provides that the right of eminent domain shall be exercised by the same procedure as by law for incorporated cities and towns. There is a proviso:

"That no public utility owned by a city or town shall be condemned hereunder, and none shall be purchased without submission of the question to the voters of the utility district. . . ."

This is the proviso that was being construed in the *Bayha* case, *supra*.

This subsection does not contain the words "within or without the district" or "within or without its limits," and is important only as it ties condemnation procedure to that provided for incorporated cities and towns.

"(c) To construct, purchase, condemn and purchase, acquire, add to, maintain, conduct and operate water works and irrigation plants and systems, *within or without its limits,* for the purpose of furnishing such public utility district, and the inhabitants thereof, and any other persons, including public and private corporations *within or without its limits,* with an ample supply of water for all uses

and purposes, public and private, including water power, domestic use and irrigation, with full and exclusive authority to sell and regulate and control the use, distribution and price thereof." (Rem. Rev. Stat., § 11610(c)) (Italics ours.)

This subsection apparently is intended to give a district the same rights, with reference to "water works and irrigation plants and systems, *within or without its limits,*" that are given, with reference to electric current, by subsection (d).

Respondent claims no authority under this subsection, and it is material only as it bears upon the purpose and intent of the enactment. If respondent possesses the right claimed under subsection (d), then it has an equal right, under (c), to acquire and operate waterworks and irrigation systems in all parts of the state.

Under this subsection, a public utility district has a right to acquire and operate waterworks and irrigation plants and systems, within or without its limits, for the purpose of furnishing such public utility district and the inhabitants thereof, and any other persons, including private and public corporations, within or without its limits, with an ample supply of water.

The first "within or without its limits" refers to providing the source of supply, and there is no question as to the right of a public utility district to go beyond its limits to acquire or establish a water supply suitable for its needs. A strict construction of the statute, as written, would limit the sale without the district to public and private corporations. A comma after "corporations," which is inserted in subsection (d), is omitted in this subsection, with the result that it reads:

". . . for the purpose of furnishing such public utility district, and the inhabitants thereof, and any other persons, including public and private corporations within or without its limits, with an ample supply of water for all uses and purposes, . . ."

The act, however, is to be liberally construed to carry out its purpose, and the purpose unquestionably is

that a public utility district, after the accomplishment of the purpose first indicated, that is,

". . . furnishing such public utility district, and the inhabitants thereof, . . . with an ample supply of water for all uses and purposes . . ."

may, as an incident thereto, furnish

". . . any other persons, including public and private corporations [,] within or without its limits, with an ample supply of water for all uses and purposes . . ."

Note that the only territory to which it is the purpose to furnish water is "such utility district"; there is no purpose, expressed or implied, to serve any other area. Beyond, or without that area, the purpose is to furnish "persons, including public and private corporations, with water." Unless furnishing water to persons "without its limits" is construed as being incidental and subordinate to the primary purpose of furnishing water to the district and the inhabitants thereof, no mention need have been made of the district or its inhabitants. The measure need only have said, "for the purpose of furnishing anybody, anywhere, with an ample supply of water."

"(d) To purchase, within or without its limits, electric current for sale and distribution within or without its limits, and to construct, condemn and purchase, purchase, acquire, add to, maintain, conduct and operate works, plants, transmission and distribution lines and facilities for generating electric current, operated either by water power, steam or other methods, within or without its limits, for the purpose of furnishing said public utility district, and the inhabitants thereof and any other person, including public and private corporations, within or without its limits, with electric current for all uses . . ." (Rem. Rev. Stat., § 11610(d))

This subsection, further, removes public utility districts from the jurisdiction and control of the director of public works and the division of public utilities; gives the district the right to deal in all kinds of accessories and equipment; and authorizes contracts to sell its surplus electric energy or water to privately owned public utilities, with the proviso that such contracts

"   .   .   .   shall not extend over a longer period than three (3) years: *Provided,* That it must at all times first make adequate provision for the needs of the district, both actual and prospective." (Rem. Rev. Stat., § 11610(d))

The first power granted by this subsection, namely, "to purchase, within or without its limits, electric current for sale and distribution within or without its limits," comes nearer to being susceptible of the broad interpretation urged by the respondent than any other language in the act. It says nothing about purchase for the purpose of furnishing the district with electric current. We do not believe that even this apparently unlimited right to purchase, and to sell the current so purchased, is consistent with the act itself or the purpose thereof; but, in any event, it is of no service to the respondent, as it deals only with the purchase of power and its resale, and not with the purchase and acquisition of the facilities for generating electric current.

The respondent must rely upon the next power granted in this subsection, that is:

"   .   .   .   to construct, condemn and purchase, purchase, acquire, add to, maintain, conduct and operate works, plants, transmission and distribution lines and facilities for generating electric current, . . . *within or without its limits, for the purpose of furnishing said public utility district, and the inhabitants thereof and any other person, including public and private corporations, within or without its limits,* with electric current for all uses, . . ." (Italics ours.)

No additional powers, except as above indicated with reference to purchase and resale, are granted here with reference to "electric current" than were granted, by subsection (c), with reference to "water works and irrigation plants and systems."

Under this subsection, a public utility district has the right to acquire and operate facilities for generating electric current within or without its limits, for the purpose of furnishing such public utility district and the residents thereof, and any other persons, including private and public corporations, within or without its limits, with electric current for all uses.

The "within or without its limits," which refers to the source of supply, needs no comment, as there is no question as to the right of a public utility district to go beyond its limits to acquire or establish a source of supply suitable for its needs. The power to purchase, acquire, and operate, is for the purpose of furnishing said public utility district, and the inhabitants thereof, with electric current for all uses. No other area and the inhabitants of no other area are mentioned. Beyond, or without that area, the purpose is to furnish *persons*, to wit, "any other person, including public and private corporations, within or without its limits," with electric current for all uses.

It is apparent to us that the purpose of furnishing power to *persons*, including public and private corporations, beyond its limits, was intended to be incidental and subordinate to the primary purpose of furnishing electric current to the district and its inhabitants. Any other interpretation would have made it unnecessary to refer to the district or its inhabitants, and would leave those words without meaning or significance.

The limitation on the duration of any contract which the district might make to supply privately owned utilities, and the proviso that, in the event it makes such contracts, it must first make adequate provision for the needs of the district, both actual and prospective, further supports that interpretation. There is no requirement that adequate provision for the needs of persons without the district shall be made before the district can make such a contract: adequate provision is required only for the "needs of the district."

"(e) . . . to take, condemn and purchase, purchase, and acquire any and all public and private property . . . necessary or convenient, and, in connection with the construction, maintenance or operation, of any such utility or utilities, to acquire by purchase or condemnation and purchase the right to divert, take, retain and impound and use water from or in any lake or watercourse, . . . to erect and build *within or without its limits*, dams or other works across any river or watercourse, . . ." (Rem. Rev. Stat., § 11610(e)) (Italics ours.) .

Various other rights with reference to lakes, rivers, and other watercourses are granted; and it is provided that

". . . any such public utility district shall have the right to acquire by purchase or condemnation and purchase, or otherwise, any lands, property or privileges necessary to be had to protect the water supply of such public utility district from pollution . . ." (Rem. Rev. Stat., § 11610(e))

It is provided, also, that:

"Such public utility district shall have power to build and maintain inter-tie lines connecting its power plant and distribution system with the power plant and distribution system owned by any other public utility district, or municipal corporation, or to connect with the power plants and distribution systems owned by any municipal corporation in the district, and from any such inter-tie line to sell electric energy to any individual, or public utility district, or any city or town, or other corporations, public or private, and, by means of transmission or pole lines, to conduct electric energy from the place of production to the point of distribution, and to construct and lay said aqueducts, pipe or pole lines, and transmission lines along and upon public highways, roads and streets, and to condemn and purchase, purchase or acquire, lands, franchises and rights of way necessary for the same." (Rem. Rev. Stat., § 11610(e))

Attention was directed, in oral argument, to the fact that "within or without" was used nine times in the statute, as indicating an intent consistent with respondent's interpretation. We have previously discussed its usage on seven occasions, and the "within or without" set forth in the first portion of subsection (e), quoted above, is the eighth and last time it is used in the original act, and its use there certainly adds nothing to respondent's argument. It is conceded that public utility districts frequently must go beyond their limits to erect and build dams for the purpose of impounding water to provide an adequate supply of water for the use of the district or for generating hydroelectric power. The ninth use of "within or without" is in the 1945 amendment.

One provision in this subsection warrants special consideration. It is stated that a district may acquire, purchase, or condemn and purchase

". . . any lands, property or privileges necessary to be had *to protect the water supply of such public utility district from pollution* . . ." (Italics ours.)

The exercise of this power would protect the inhabitants of the district, and any other person, within or without the district, who might be served from the same water supply, from the dangers of pollution. However, if respondent's position is correct and such district has authority to acquire various sources of supply and, then, to serve distant communities, the authority given by this subsection is not broad enough to protect such sources of supply from pollution. This, again, points to the fact that it was intended that any *person* supplied *without the limits* must be supplied from the same source as the district and the inhabitants thereof.

The intertie provision contemplates connection with the power plants or distribution systems of other public utility districts or municipal corporations. We do not understand that respondent is basing any claim of authority on this provision.

"(f) To contract indebtedness or borrow money . . . and to issue general obligation or utility bonds therefor, . . . to purchase with surplus funds, local utility district bonds . . . and sell the same . . . and to create a revolving fund to insure the prompt payment of all local utility district bonds." (Rem. Rev. Stat., § 11610 (f))

The local utility districts which would issue the bonds herein provided for, come into existence under the powers contained in subsection (1).

"(g) To . . . levy . . . an annual tax on all taxable property within such public utility district not exceeding two mills in any one year, exclusive of interest and redemption for general obligation bonds. . . ." (Rem. Rev. Stat., § 11610 (g))

It also provides budget procedure, and for warrants to be issued in anticipation of revenue.

"(h)  To enter into any contract with the United States Government, or any state, municipality or other utility district, or any department of those governing bodies, for carrying out any of the powers authorized by this act." (Rem. Rev. Stat., § 11610(h))

Respondents rely somewhat upon this grant of power, but it has equal applicability, and there is greater necessity for it, under the interpretation which we have placed on subsections (c) and (d).

"(i)  To acquire by gift, devise, bequest, lease or purchase, real and personal property necessary or convenient *for the purposes of the district or any local district therein.*" (Rem. Rev. Stat., § 11610(i))  (Italics ours.)

The "district," as used here and throughout this act, is thought of as a geographic area, and reference is made to "any local district *therein.*"

"(i)  To acquire by gift, devise, bequest, lease or purchase, real and personal property necessary or convenient to  .  .  .  appoint a manager [and fix his salary]  .  .  ." (Rem. Rev. Stat., § 11610(j))

The duties of the manager take more than a page of the session laws.  Among other things, it is provided that he

" .  .  .  shall be the chief administrative officer of the *public utility district,* and shall have control of *administrative functions of the district,* and shall  .  .  .  keep the commission fully advised as to the *financial condition and needs of the district.*  .  .  ." (Rem. Rev. Stat., § 11610(j).)  (Italics ours.)

"(k)  To sue and be sued in any court of competent jurisdiction; *Provided,* That all suits against the public utility district shall be brought *in the county in which the public utility district is located.* No suit for damages shall be maintained against such public utility district except on the basis of a claim therefor filed with the commission of such district complying in all respects with the terms and requirements for claims for damages filed pursuant to general law against cities of the second class." (Rem. Rev. Stat., § 11610(k))  (Italics ours.)

This subsection indicates that no extensive or widespread operation beyond the limits of the district was in the minds

of those who drafted this legislation, or of the people who voted for it. Certainly it was not contemplated that a situation would develop where residents of King and Pierce counties, constituting a great majority of a district's customers and employees, would have to file their claims and wage their suits in Skagit county.

"(l) . . . to establish and define the boundaries of local assessment districts to be known as Local Utility District No. .......... for the distribution . . . of water for domestic use and (or) irrigation and (or) electric energy . . ." (Rem. Rev. Stat., § 11610(1))

This subsection also provides for special assessments on property specially benefited, and for determination of the proportion of the costs of an improvement that "shall be borne by such local improvement district, and what proportion of the cost, if any, shall be borne *by the entire public utility district.*"

"(m) It is, and shall be lawful for any public utility district organized hereunder to sell and convey all the works, plants, systems, utilities and properties authorized by this act and owned by it after proceedings had as required by sections 9512, 9513 and 9514 of Remington's Compiled Statutes of Washington: *Provided,* That three-fifths (⅗) of the voters voting for such sale, in lieu of a majority shall be necessary. . . ." (Rem. Rev. Stat., § 11610(m))

Considerable reliance is placed by respondent on an amendment to this section by the 1945 legislature, which made several changes in the subsection, the principal one of which was the addition of a second proviso, reading:

*"Provided further,* That any public utility district may sell, convey, lease or otherwise dispose of all or any part of the property owned by it, located outside its boundaries, to any other public utility district, city, town or other municipal corporation without the approval of the voters; or may sell, convey, lease or otherwise dispose of, to any person, firm, corporation or public body, any part either *within or without its boundaries,* which shall have become unserviceable, inadequate, obsolete, worn out or unfit to be used in the operations of the system and which is no longer necessary, material to and useful in such operations without the approval of the voters. . . ." (Laws of 1945,

chapter 143, p. 402, § 1; Rem. Supp. 1945, § 11610(m)) (Italics ours.) .

This proviso makes possible the resale of the Puget Sound properties acquired by the Skagit district, without submitting the matter to a vote; it does not, in any way, shed any light on the question of the intention of the people, acting as a legislature, in the year 1930. The ninth appearance of "within or without" is of no consequence.

While this amendment gives authority to sell and convey certain kinds of property without the approval of the voters, it still does not give a public utility district authority to acquire or operate a "vast system operating in eighteen counties."

"(n) The commission of each public utility district may adopt general resolutions to carry out the purposes, objects and provisions of this act." (Rem. Rev. Stat., § 11610(n))

This concludes the enumeration of powers set forth in § 6.

Section 7 (Rem. Rev. Stat., § 11611) provides that acquisition of any public utility shall be in conformity with a system or plan adopted by the commission, which must be approved by the electors if the general obligation indebtedness is to be increased beyond certain limits. It sets forth, in detail, provisions relative to the sale, issuance, and payment of bonds. Certain new provisions, not material to our consideration here, were made in 1941, chapter 182, p. 518 (Rem. Supp. 1941, §§ 11611-1–11611-13), and in 1945, chapter 143, p. 414, § 2 (Rem. Supp. 1945, § 11611-3).

Section 8 (Rem. Rev. Stat., § 11612) deals with compensation of commissioners, the organization of the commission, recording of proceedings, calling for bids, reviewing bids, awarding contracts, fixing wage scales, and provides that:

"The commission, in fixing such minimum scale of wages shall fix the same as nearly as possible to the current prevailing and going wages within the district for work of like character." (Rem. Rev. Stat., § 11612.)

The applicability of the "current prevailing and going wages *within the district*" to contracts in remote and more populous areas, was likewise clearly not within the contemplation of the people, acting as a legislature.

Section 9 (Rem. Rev. Stat., § 11613) makes the county treasurer of the county in which is located any *public utility district,* the treasurer of the district; provides for special funds; provides that all such *public utility district funds* shall be deposited in the *county* depositories.

Section 10 (Rem. Rev. Stat., § 11614) provides that two or more public utility districts may be consolidated into one, and provides for the addition of new territory to any public utility district. This appears to be the section of the act that was intended to make possible such acquisitions as the respondent seeks to effectuate under the provisions of § 6(d). Certain phases of a consolidation under this section involve the inconvenience and uncertainty of a popular vote.

Section 11 (Rem. Rev. Stat., § 11615) states that invalidity of any part of the act shall not affect the balance, and that:

"The rule of strict construction shall have no application to this act, but the same shall be liberally construed, in order to carry out the purposes and objects for which this act is intended.

"When this act comes in conflict with any provision, limitation or restriction in any other law, this act shall govern and control." (Rem. Rev. Stat., § 11615.)

Much emphasis has been placed upon the rule of liberal construction herein provided for. We already have indicated, under the discussion of § 6(c), that we are prepared to give this act a liberal construction, "to carry out the purposes and objects for which this act is intended." Respondent asks, not a liberal, but a revolutionary construction, to carry out purposes and objects for which the act was not intended.

Section 12 (Rem. Rev. Stat., § 11616) provides that the act shall not be deemed as repealing other acts relating to construction and operation of public utilities, irrigation, or water districts, or other municipal corporations, but as supplemental thereto. It provides that the district shall not include any municipal corporation which owns or operates all the utilities therein authorized. It also forbids taxing

of any irrigation or water district or other municipal corporation, to pay for any utility if it owns a utility of like character.

Looking now at the act as a whole, we find that it concerns itself with the problems of supplying water for irrigation and domestic use, and electric current, for public utility districts comprising a county or less. It makes detailed provision for the development of smaller "local utility districts" *within* such public utility district. There is nothing (not even the isolated words relied upon by the respondent, when read with the other purposes of acquisition) which indicates that the act was intended to give public utility districts the power to engage in business beyond their limits on the grandiose scale here contemplated, and there are numerous provisions that are inconsistent with any such idea.

██ Respondent has reiterated again and again, in its brief and in oral argument, the words "within or without its limits," as if those words must, in themselves, be decisive of the case. There is no magic in words. A phrase from an enactment cannot be separated from its context, divorced from the other sections of the act, and then be utilized to change the very purpose of the act itself. There is, in the words "within or without," no open sesame to a new interpretation of the public utility district law, and no magical abracadabra that enables any district to go into the electric power business on the basis here contemplated. As we have but recently said:

"A thing within the letter of the law, but not within its spirit, may be held inoperative where it would lead to an absurd conclusion." *Discargar v. Seattle,* 25 Wn. (2d) 306, 171 P. (2d) 205.

We are not unmindful of the cases construing the statutes of other states, and particularly those of Oregon, Nebraska, and Kansas, which are so strongly relied upon by the respondent.

Article XI, § 12, of the Oregon constitution, provides that people's utility districts "may sell, distribute and/or otherwise dispose of water, water power and electric energy

within or without the territory of such districts." Section 114-245, Oregon Compiled Laws, as amended by chapter 287 of the Laws of 1941, gives such utility districts that power in the exact words of the constitutional provision. Answering the contention that sale and distribution without the district should be only incidental to the major operations within the district, the Oregon supreme court, in *Central Lincoln Peoples' Utility Dist. v. Smith,* 170 Ore. 356, 133 P. (2d) 702, quoted the constitution and the statute and said:

"We are unable, under the law, to place such a restriction upon the operations of a utility district. The authority of a utility district to operate 'within or without' its boundaries is conferred upon it in plain, simple, unambiguous language. There is no need of construction when the language is reasonably susceptible of only one meaning."

That case and other Oregon cases, such as *Ollilo v. Clatskanie Peoples' Utility Dist.,* 170 Ore. 173, 132 P. (2d) 416, are easily distinguished, because, entirely aside from the fact that we have in those cases no question of legislative history and intent, we do not have a statement in the act itself, as we do in our own statute, that the supply of electric current is being acquired "for the purpose of furnishing such public utility district, and the inhabitants thereof," with electric current for all uses.

The other cases relied upon by the respondent are city cases. Respondent quotes at length from *Curtis v. Maywood Light Co.,* 137 Neb. 119, 288 N. W. 503. The question there presented was the right of the city of Curtis to acquire an electric plant in the village of Maywood, and to operate it. The court held that it had the right, under the express terms of the Nebraska statute, saying:

"The exact words of the statute empower the city of Curtis to extend its electric light and power system 'beyond its boundaries, and for that purpose (it) is hereby authorized and empowered to construct, purchase, lease, or otherwise acquire, and to maintain, improve, extend, and operate electric light and power plants, distribution systems and transmission lines, outside of the boundaries of such city, . . . for such distance and over such territory within this state as may be deemed expedient.' But, not satisfied

with an absolutely unconditional grant of power, which manifestly and necessarily includes the right to operate within the domain of other cities or villages, the legislature has added thereto the words, 'The provisions of this act shall be deemed cumulative and the authority herein granted to cities, villages . . . shall not be limited or made inoperative by any existing statute.' In this connection it may be said that, obviously, statutes are the sole source of municipal rights and powers. In addition, section 2, quoted above, necessarily contemplates that one city may carry on the business of selling electrical current within the corporate boundary of another 'upon such terms and conditions as may be agreed upon between the contracting cities.' "

There is enough of the Nebraska statutory provisions quoted in the opinion to indicate that there is a direct, explicit, and detailed enumeration of what the city could do beyond its boundaries.

The statute did not stop with saying that the city could operate without its boundaries, but it enumerated what it could do, and it said how far— "for such distance or over such territory within this state as may be deemed expedient." The difference in wording and in the purpose of the Nebraska statute there construed and the Washington statute here construed, is so apparent that discussion is unnecessary.

The case of *Kansas Gas & Electric Co. v. McPherson,* 146 Kan. 614, 72 P. (2d) 985, also relied on by respondent, is not apposite for two reasons: First, the Kansas statutes are direct and explicit and have no resemblance to the Washington statute now under consideration. We quote the following sections from the General Statutes of Kansas, 1935:

"12-806. . . . All cities of the state owning their own electric-light, heat or power plant are hereby authorized and empowered to furnish electric light, heat or power to districts *lying outside of the limits of such cities,* and charge for such service such rates as may be provided by ordinance." (Italics ours.)

"12-808. . . . Any city operating waterworks, fuel, power, or lighting plant may sell and dispose of water, fuel, power or light to any person *within or without said city."* (Italics ours.)

"12-817. . . . That the governing body of any city acquiring a waterworks plant, or part thereof, may make a contract with any person, city or corporation, located *within or without this state,* for the purchase and supplying of water for all purposes to such city for its own use or to supply all other consumers." (Italics ours.)

"12-821. . . . Any city operating any waterworks, fuel, power or lighting plant or sewer system *may extend its mains, transmission lines or pipe lines within or without the city* by construction or purchase, when applications have been made and agreements entered into by persons along the proposed extension that will produce a revenue in the judgment of the governing body, sufficient to pay interest on the cost of the extension, and the operating cost of the product or service furnished." (Italics ours.)

These statutes, which were referred to by the supreme court of Kansas in its decision, are obviously not comparable to our own.

A second basis of distinction is that the Kansas statutes construed in that decision are concerned with the powers of a city *owning or operating* its water, electric, or heating system, *to extend* its services. We are here concerned with the power *to acquire and operate.* If Skagit district had been authorized to, and had already acquired and was now operating the Puget Sound properties, and it was a question as to whether it could extend its lines to serve certain people "without its limits," we would have a comparable factual situation to that presented by the Kansas case.

This opinion has been unduly extended by reason of the fact that we have felt it desirable to examine the public utility district law in detail, that the legislative intent might be ascertained, not from the literal meaning of the words "within or without," but from the text of the statute as a whole, interpreted in the light of the general object and purpose of the act, and its legislative history. Much that has been said has been by way of explanation and argument, and, therefore, we summarize the points that are here decided.

The primary purpose of the power granted to a public utility district by subsection (d) of § 6, chapter 1, Laws of

1931 (Rem. Rev. Stat., § 11610 (d) ) is to furnish the district, and the inhabitants thereof, with electric current for all uses, and, as an incident thereto, it may furnish any other persons, including public and private corporations, within or without its limits, with such current for all uses.

The right given, under subsection (d), to construct, condemn and purchase, purchase, and acquire plants, transmission and distribution lines, and facilities for generating electric current, is subject to the limitation that the facilities acquired must not be unreasonably large or entirely inappropriate for the accomplishment of that primary purpose.

The Skagit district has approximately five per cent of the customers and approximately five per cent of the power consumption of the Puget Sound integrated system. If this plan were approved, Skagit district would furnish power, at wholesale, to districts which have six times as many customers and which use six times as much power. It would be furnishing power, at retail, to an "unorganized" area with more than nine times as many customers and using more than ten times as much power.

We quoted testimony to the effect that it is necessary for Skagit district to acquire the entire system, because it is integrated. The figures show that it is planned to disintegrate it immediately, by cutting off 31,365 customers (there are only 12,027 customers in Skagit district), who used 131,936,640 kilowatt-hours in 1944 (only 71,511,955 kilowatt-hours used in Skagit district during that period), and by disposing of seven small generating plants.

We are somewhat skeptical as to Mr. Beck's testimony that the Baker river plant, which, operated at a maximum demonstrated capacity, would produce 360,036,000 kilowatt-hours per year, would not be able to supply Skagit district's needs (71,511,955 kilowatt-hours sold in 1944), even during periods when streams are frozen. Certainly the district could safeguard against any such contingencies at a comparatively small expense, by taking advantage of the power given it to make interties with other systems.

The most that could be claimed for Mr. Beck's testimony is that the Baker river and Rock island plants are both

needed to supply the present and future needs of Skagit district. Skagit district may be warranted in acquiring both of these generating plants to adequately meet present and future ascertainable needs of the district and the inhabitants thereof, but it is impossible to envision any necessity for purchasing the Shuffleton, White river, Electron, Snoqualmie, and Georgetown plants for the purpose of serving that district or its inhabitants. That would not be an acquisition· in advance of future needs; it would be acquiring facilities which are, and would be, totally unnecessary, at least so far as the discernible future is concerned.

The evidence clearly demonstrates that the facilities here sought to be acquired are unreasonably large and entirely inappropriate for the accomplishment of the primary purpose of the Skagit district.

The order of the trial court will be reversed, and the superior court of Skagit county is directed to enter an order denying the application for the writ of mandate applied for by the respondent.

MILLARD, STEINERT, and SIMPSON, JJ., concur.

SCHWELLENBACH, J. (concurring)—A study of the entire act convinces me that its purpose was to provide for the formation of a number of public utility districts, each one coextensive with the boundaries of the county where it was to be formed, and each one independent of the other. Its purpose was to provide electric energy for the inhabitants of each district so formed, and not that any one district could provide such energy to the people of the state at large. Each district was to be a separate unit. In order to better conduct its affairs *as a unit*, provision was made that each district, *as a unit*, could operate both *within and without the district*. The act is replete with provisions for the operation of each district *as a district*.

The framers of the act contemplated that some districts would not have sufficient electric energy to furnish their inhabitants, so it was provided in § 6, subd. (e) (Rem. Rev. Stat., § 11610 [P.P.C. § 833-11] (e)), that one district could build and maintain intertie lines to connect with another

district or municipal corporation. They contemplated that situations might arise where the acquisition of a large system could be more economically and more expeditiously accomplished by a district larger than a county in area, population, and wealth, so they wisely included in § 10 (Rem. Rev. Stat., § 11614 [P.P.C. § 833-19]), that two or more contiguous districts might consolidate, or that the boundaries of any public utility district might be enlarged and new territory included therein.

The machinery to handle a situation, such as here proposed, was provided for in the act. However, it is not being used by respondent in its proposed plan. I cannot find authority in the act for the acquisition of the Puget Sound properties in the manner proposed.

JEFFERS, J. (dissenting)—I am unable to agree with the majority opinion.

May I emphasize the fact that the evidence in this case shows without dispute that the Skagit district is not acting alone in this transaction, but that it is in fact an effort on the part of the fifteen public utility districts in the territory served by the Puget Sound Power & Light Company to acquire the properties of the company, primarily for the purpose of furnishing electric energy to the inhabitants of the respective districts.

The properties of Puget Sound are located in eighteen counties of the state. Public utility districts have been organized in all of the eighteen counties, except King, Pierce, and Island. The three last-named counties will be referred to as the unorganized territory.

The Puget Sound properties have been classified as "production" and "distribution."

The bonds referred to in the majority opinion represent the proposed purchase price to be paid by Skagit and nine other public utility districts for the entire electric generating, transmission, and distribution system of Puget Sound within the state of Washington. While the counties of Grays Harbor, Jefferson, and Kittitas have public utility districts, and the plan contemplates that these districts

would acquire the distribution systems within their respective limits, at the time of trial they had not contracted so to do.

I desire to say further that the evidence is conclusive that, under the proposed plan, the Skagit district, instead of imposing its management and control over the extensive territory served by Puget Sound outside its boundaries, has in fact merely been selected by the other districts as the agency for continuing the operation of the generating and transmission facilities of the system, and for serving the unorganized area. Under the contemplated plan and the contracts entered into between Skagit and the following named districts, to wit, Cowlitz, Thurston, Lewis, Pacific, Whatcom, Snohomish, Chelan, Kitsap, and Mason county districts, Skagit will immediately sell to the named districts the distribution systems located therein. Such sales are to be made pursuant to purchase-participating power contracts.

The public utility districts of Douglas and Grant counties, respectively, have proposed separate contracts requesting and consenting that Chelan county public utility district purchase from Skagit the distribution facilities of Puget Sound located in Douglas and Grant counties, and operate the business of distributing electricity in the latter counties through the Chelan district.

I am further of the opinion that the proposed plan does and will preserve to the people of the unorganized area all of the nonprofit benefits of public operation of the public utility districts law.

The proposed plan here under consideration is the result of repeated efforts on the part of the public utility districts over a period of years to acquire the properties of Puget Sound serving their respective counties. Prior to the institution of the present proposal of purchase, there had been unsuccessful efforts to make piecemeal acquisition of certain portions of Puget Sound's properties by condemnation, by negotiation and sale, by joint negotiation of the districts, and by joint negotiations of the districts and Bonneville power administration.

The combined efforts of the public utility districts which are now endeavoring to acquire the Puget Sound system resulted in nine separate resolutions and proposed contracts authorizing Skagit to purchase the Puget Sound system, and approving and ratifying all the proposed terms of sale and method of payment embraced in Skagit's offer. The manner in which the respective districts would acquire that portion of the distribution system of Puget Sound located within each district, the contemplated purchase price thereof to each district, the setting up of separate funds for the retirement of the bonds which represent the original purchase price of the system, and the establishment of further separate funds by Skagit to be sustained by Skagit from revenues from the unorganized area, together with the assumption of rights and liabilities by each of the respective districts participating in the purchase, are all outlined in the contracts referred to. These contractual obligations are further sought to be ratified by concurring resolutions of each of the affiliate districts, and by the resolution adopted by Skagit, in which the entire plan of purchase and resale to the affiliates is carefully set forth.

It is thus apparent that the offer for the purchase of Puget Sound's entire system is not a single offer by Skagit alone, but is supported by the affiliate districts.

The purchase plan further contemplates that the possession, operation, and control of the distribution properties in all public utility districts which are parties to the purchase agreement, and in five additional districts, are to be turned over to the respective districts, and title thereto is proposed to be conveyed upon retirement of an amount of Skagit bonds equal to the cost of the properties located in each of the purchasing districts.

By the terms of the contracts, Skagit is required to operate the distribution properties within its own limits as if it were a separate utility, and may not commingle the revenues received from Skagit with the revenues received from territory outside the Skagit district. It is further provided that all revenues received by Skagit from the distribution properties in the unorganized area, namely, King,

Pierce, and Island counties, must be kept separate and distinct from all other revenues; that these funds are to be used for the purpose of paying the cost of acquiring such properties and the operation and maintenance thereof, and the renewal, replacement, extension, and betterment thereof; and that they may not be used for the benefit of operations in Skagit, or to pay the cost to Skagit district of acquiring the distribution properties in that district. Sale of power on a wholesale basis by Skagit to the other districts is to be made at the actual cost of production and transmission, plus fixed charges upon an agreed amount of bonds representing the cost of acquiring the production properties.

The revenues of the production properties are to be kept separate from all other revenues of the Skagit district, and may not be used to pay costs in connection with the distribution properties in Skagit county. The contracts further provide that Skagit must pay into the production properties revenue fund, from its revenues from operation in Skagit county, the same rates for wholesale power as are paid by each of the other districts. Skagit must also pay into the production properties revenue fund, from the revenues received from King, Pierce, and Island counties, the cost for power distributed in those counties, at the same rate for wholesale power as is paid by the other districts.

The contracts further provide that all public utility districts within the proposed plan to purchase distribution systems are to participate in the beneficial ownership of the production properties ratably in proportion to the amount of power purchased from the production properties. Skagit may realize no profit for itself from the ownership, operation, sale, or other disposition or use of the production properties, or of the distribution properties, in King, Pierce, and Island counties. Skagit is obligated by contract and by law to fix and collect rates and charges for service which are fair and nondiscriminatory.

Each of the proposed contracts between Skagit and the other public utility districts affiliated in the purchase, and the districts which are to purchase only electrical energy

from Skagit, has been ratified by resolution of each of these districts; and the resolutions further provide that each of the districts joining with Skagit in the purchase of the Puget Sound system, has authorized the Skagit district to act as an agency to accomplish the acquisition of the properties of Puget Sound under the joint plan outlined.

I have set out the proposed plan at some length, in order to show just what the status of Skagit is in this transaction, and to dissipate any idea that Skagit proposes to go into the production and distribution of electrical energy on a "grandiose scale," entirely independent and apart from the needs of the inhabitants of the district.

It seems to me that a fair and impartial consideration of this transaction is absolutely convincing of the fact that it was never intended that Skagit should acquire either the distribution or production properties of Puget Sound solely for its own benefit and profit, but that Skagit and the other districts, in order to obtain electrical energy for the inhabitants of their respective districts, are compelled to acquire this entire system; that the respective districts are to acquire the distribution properties within their respective districts, and are to participate in the production properties as their needs require.

So far as I know, it has not been contended by Skagit that all of such production properties are essential to its operation within its boundaries, but, to the contrary, it is contended that it is necessary and essential that these districts, in order to obtain electrical energy for the respective districts, acquire all the distribution and production properties of Puget Sound.

I do not deem it necessary to set out all the provisions of the public utility districts act, as they are quite fully set out in the majority opinion, but I shall refer to such parts of the act as seem necessary.

Primarily, this case involves the question of the express powers granted to public utility districts, and the powers necessarily implied from those expressly granted.

This court, in *Bayha v. Public Utility Dist. No. 1*, 2 Wn. (2d) 85, 97 P. (2d) 614, had the following to say relative to the powers granted to the commissioners of public utility districts under Rem. Rev. Stat., § 11610 [P.P.C. § 833-11]:

"The legislature has seen fit to vest the commissioners of a public utility district with almost unlimited powers relative to the construction, purchase, etc., of utilities, and in the sale of utility revenue bonds to finance such operations. This the legislature had a right to do, and we cannot therefore limit the powers granted unless such limitation is plain, nor can we otherwise interfere with the exercise of the powers granted unless such powers are exercised capriciously and arbitrarily, or fraudulently."

Again, in *Rumbolz v. Public Utility Dist. No. 1*, 22 Wn. (2d) 724, 157 P. (2d) 927, we referred to the vast and sweeping powers which the statute gives to the district commissioners, especially when supplemented by the following provision found in Rem. Rev. Stat., § 11615 [P.P.C. § 833-15]:

"The rule of strict construction shall have no application to this act, but the same shall be liberally construed, in order to carry out the purposes and objects for which this act is intended."

The public utility districts law, Rem. Rev. Stat., §§ 11605 to 11616 [P.P.C. §§ 833-1 to 833-23], inclusive, was adopted as an initiative measure by the voters of this state at a general election held November 4, 1930. The purpose of the act and the objects sought to be obtained thereby will be found in § 11605, and are

" . . . to authorize the establishment of public utility districts to conserve the water and power resources of the State of Washington for the benefit of the people thereof, and to supply public utility service, including water and electricity for all uses."

The rule which is to govern the construction of this act is specifically set out in § 11615, and is as above quoted.

In *Carstens v. Public Utility Dist. No. 1*, 8 Wn. (2d) 136, 111 P. (2d) 583, we stated:

"In discussing the questions presented in this case, we have in mind that

" 'The rule of strict construction shall have no application to this act, but the same shall be liberally construed, in order to carry out the purposes and objects for which this act is intended.' Rem. Rev. Stat., § 11615 [P. C. § 4498-21].''

It is conceded that the desirability or advisability of a transaction such as the one with which we are here concerned does not present a question for the courts to decide, if the transaction is otherwise within the powers of the district.

Appellants offered no evidence at the trial of this case.

I find nothing in the record which indicates that the Skagit district commissioners acted capriciously, arbitrarily, or fraudulently; but to the contrary, the record shows that such commissioners and the commissioners of the other districts acted upon the advice of competent counsel and under the belief that the statute authorized every step taken by them.

The majority opinion admits, as it must, that under the plain, unambiguous language of § 11610, all public utility districts organized under the provisions of this act have the power:

"(a)  To make a survey of hydro-electric power, irrigation and domestic water supply resources *within or without the district*, and to compile comprehensive maps and plans showing the territory that can be most economically served by the various resources and utilities, the natural order in which they should be developed, and how they may be joined and co-ordinated to make a complete and systematic whole;   .  .  .

"(c)  To construct, purchase, condemn and purchase, acquire, add to, maintain, conduct and operate water works and irrigation plants and systems, *within or without its limits*, for the purpose of furnishing such public utility district, and the inhabitants thereof, and any other persons, including public and private corporations *within or without its limits*, with an ample supply of water for all uses and purposes, public and private, including water power, domestic use and irrigation, with full and exclusive authority to sell and regulate and control the use, distribution and price thereof.

"(d)  To purchase, *within or without its limits*, electric current for sale and distribution *within or without its limits*,

and to construct, condemn and purchase, purchase, acquire, add to, maintain, conduct and operate works, plants, transmission and distribution lines and facilities for generating electric current, operated either by water power, steam or other methods, *within or without its limits,* for the purpose of furnishing said public utility district, and the inhabitants thereof and any other person, including public and private corporations, *within or without its limits,* with electric current for all uses   .   .   .

"(e)   And for the purposes aforesaid, it shall be lawful for any public utility district so organized to take, condemn and purchase, purchase, and acquire any and all public, and private property, franchises and property rights, including state, county and school lands, and property and littoral and water rights, for any of the purposes aforesaid   .   .   .

"(h)   To enter into any contract with the United States Government, or any state, *municipality or other utility district,* or any department of those governing bodies, for carrying out any of the powers authorized by this act." (Italics mine.)

As stated, the majority opinion admits, as it must, that the power is expressly given by the act to do the things above enumerated, both within and without the boundaries of the district; but the majority opinion seeks to place upon such power what seems to me to be an arbitrary limitation, not justified by the act itself or the decisions, by stating that it was not the intent of the act to give to any public utility district the power to enter into a transaction such as here contemplated.

The majority opinion does not attempt to discuss many of the questions raised by the respective parties to this controversy in their briefs, but confines itself largely to a discussion of the powers granted to a public utility district. I realize, of course, that if the districts here involved, and I use the word "districts" advisedly, are not by the statute granted the express power to do the acts contemplated by this transaction, or powers implied from those expressly granted, some of the other questions raised become immaterial; but it seems to me that the majority opinion does not in fact consider this entire transaction. While it is true the majority opinion refers to the districts other than Skagit,

it seems to me that the conclusions reached in such opinion are in fact based upon the theory that Skagit alone is acquiring the Puget Sound system.

I do not think it has ever been contended that all of the production properties of Puget Sound are essential to the operation of Skagit alone, nor has it ever been contended that the acquisition of all the distribution properties is essential to the operations of Skagit alone; but, to the contrary, it is contended that the only method by which the essential needs of the inhabitants of the respective districts for power can be supplied is by the acquisition of the entire Puget Sound system.

The majority opinion states that respondent urges that the words "within and without its limits," are clear and unambiguous, and afford no basis for judicial construction. The opinion then states:

"To carry respondent's argument to its logical conclusion, means that the Skagit district not only could acquire the properties of Puget Sound, but it could acquire those of the Washington Water Power Co. and the Pacific Power & Light Co. serving the great industrial, mining, and agricultural areas of eastern Washington. By the same token, a public utility district in Pend Oreille county, in the northeastern corner of the state, could acquire the Puget Sound properties."

I am of the opinion that such a contention never has been and never will be made, and certainly is not made in this case. I appreciate that, in our zeal to illustrate some point, we are all, perhaps, prone to give extreme illustrations of what might or could happen, but frankly, I am not much impressed with such extreme illustrations, especially where they seem to me to have no real basis.

I have never heard it contended that, under the public utility districts law, a district could acquire any properties or facilities, unless such acquisition had as its main purpose the furnishing of some service to the inhabitants of such district. I will frankly admit that, if it were the purpose of this transaction that Skagit alone was attempting to acquire and operate the entire Puget Sound system over the

entire area served by Puget Sound, the conclusions reached by the majority opinion would be justified, but such admittedly is not the plan. To the contrary, both the distribution and production systems are in fact to be acquired primarily to meet the essential needs of all the affiliated districts. When the transaction is considered in this light, it presents an entirely different situation from that which forms the basis of appellant's contention, as well as the basis of the majority opinion.

Because the Puget Sound was an integrated system, and because of the impossibility of acquiring this system piecemeal, that is, each district acquiring that particular part of Puget Sound which it deemed essential to operation within and without its boundaries, it became necessary to acquire the system as a whole. To accomplish the ends desired by the respective districts, that is, to enable such districts to acquire the properties and facilities necessary for the operation of the respective districts, Skagit was to be the agency through which this result was to be attained.

As supporting its theory that the statute was not intended to confer the powers here claimed by respondent, the majority opinion discusses what it refers to as the history of the act. It refers to the pamphlet compiled and issued by the secretary of state, which contains arguments for and against the initiative measure. The majority opinion also sets out a statement made by Senator Homer T. Bone, and then states:

"It is obvious that the sponsors of this initiative had no intention of giving the public utility district powers which incorporated cities did not possess. It is likewise conceded that, if the contention of respondent be sustained, public utility districts do have powers vastly greater than those possessed by any incorporated city in the state, then or now."

The majority opinion continues:

"The proponents prevailed in the election, and, while no one can say why the people voted in a certain way on a certain measure, the argument is persuasive, if not conclusive, that the majority of the people had adopted the argument of the prevailing side."

In considering this act and its plain import, I am frank to say that I am not much impressed with the argument made by either the proponents or opponents of the act, or by any statement which may have been made by Senator Bone before the House and Senate subcommittee on the Columbia power administration bill. The suggestion that the voting public, at the time it voted on this initiative, knew what the powers of cities were, or that it was influenced in voting for the measure because of any statement made by the proponents that the powers granted to a public utility district were the same as those granted to cities, is unbelievable; but, be that as it may, when it becomes the duty of a court to pass upon a statute, the court must be primarily governed by the language of the statute itself, and where such language is plain and unambiguous, and the intent may plainly be gathered from the act itself, there is no need to go further.

The majority opinion next refers to one of the alternate plans proposed by respondent for taking over the assets of Puget Sound by acquiring two thirds of the corporate stock and proceeding with the dissolution of Puget Sound. The opinion then quotes Art. VIII, § 7, of our state constitution. The opinion does not pass upon the question of whether or not the above plan violates the constitutional provision, but makes the reference merely for the purpose of showing that respondent "does not regard judicial construction as forbidden even where words are, in fact, clear and unambiguous."

I am of the opinion that the authority to the effect that a plan such as above proposed does not violate a constitutional provision such as Art. VIII, § 7, *supra,* is so overwhelming that a contention to the contrary could not be logically made. See *State ex rel. Johnson v. Consumers Public Power Dist.,* 143 Neb. 753, 10 N. W. (2d) 784, 152 A. L. R. 480; *Long v. Mayo,* 271 Ky. 192, 111 S. W. (2d) 633; *Springfield v. Monday,* 353 Mo. 981, 185 S. W. (2d) 788; *People ex rel. Murphy v. Kelly,* 76 N. Y. 475.

This court, in the early case of *Rauch v. Chapman,* 16 Wash. 568, 48 Pac. 253, 36 L. R. A. 407, has recognized that

the prohibition contained in Art. VIII, § 7, is not applicable to a situation such as above presented.

The majority opinion states:

"If, as its sponsors and coauthor state, it was their intention to give public utility districts the same rights that cities then had, we may profitably inquire as to what those rights were then understood to be."

The opinion then refers to the cases of *Langdon v. Walla Walla,* 112 Wash. 446, 193 Pac. 1; *Spear v. Bremerton,* 90 Wash. 507, 156 Pac. 825; *Tacoma v. Nisqually Power Co.,* 57 Wash. 420, 107 Pac. 199; *Chandler v. Seattle,* 80 Wash. 154, 141 Pac. 331; *Jones v. Centralia,* 157 Wash. 194, 289 Pac. 3; and *Municipal League of Bremerton v. Tacoma,* 166 Wash. 82, 6 P. (2d) 587.

I will admit that in 1930 it had not been decided by this court that cities had any greater powers than as indicated by the cited cases. However, I doubt if it can be said that any of the cited cases purported to place an absolute limitation upon the powers granted to cities. What this court did do in the cited cases was to consider the particular facts, and then determine whether or not the acts to be performed were within the powers of the city. Even the quotation from *Jones v. Centralia,* found in the majority opinion, is, in my opinion, certainly not specific, where it says:

" 'The courts would restrain the construction of an unreasonably large plant or one for any reason entirely inappropriate to the service for which it may lawfully be designed.' "

However, I am unable to agree that the express powers granted to public utility districts, and the powers necessarily implied from those granted, are no greater than those granted to cities. In the first place, the essential purpose of creating cities was to govern those residing within their geographical boundaries. Pursuant to such theory, the courts early, in passing upon the powers of cities, tended to restrict their powers, then almost solely governmental, to functions to be performed within the limits of the city. As time went on and the need of certain services and facilities increased, additional powers were granted to cities to ac-

quire, in particular, basic necessities, such as water, etc., even though it required going outside the city limits to accomplish this purpose. However, as the power of such municipalities to tax was limited to the taxation of property within the cities' limits, the courts carefully guarded the property and rights of taxpayers within the cities, and restrained the expenditure of city tax funds for purposes which extended beyond the boundaries of the cities unless it plainly appeared that a contrary intent was indicated.

Public utility districts were not created for governmental purposes, and they discharge no strictly governmental functions. The functions of a public utility district are proprietary, and because of the nature of the functions to be performed, such districts have, from the time of their creation, been given by statute the power to operate outside their geographical limits.

I am of the opinion that the first section of the public utility district act, as well as the other sections of the act, recognize that natural resources for the production of power are not confined to narrow geographical limits, and would not be confined to the limits of any one or more districts; that the act here in question was drawn with the thought in mind that it would be necessary to go outside of the boundaries of a district to procure such power; and that, in order that areas outside of any such district might also have the benefit of such power resources, it was provided in the act that any district formed under the provisions of the act could not only purchase, *within or without its limits*, electric current for sale and distribution within its limits, for the purpose of furnishing such district and the inhabitants thereof with electric current for all uses, but could also sell and distribute electric current outside its limits.

It is my opinion that appellants in this case were forced into making the contention that the powers granted to public utility districts were no greater than those granted to cities, for otherwise they would have no ground to support their theories in this action.

In my opinion, the majority opinion is in fact based upon the same premise, which I do not think can be supported, for the reason hereinbefore stated, and for the further reason that the wording of the statute wherein certain powers are granted to public utility districts is different from the wording of the statutes wherein certain powers are granted to cities, and because of the decisions which hold that such districts, having been granted powers similar to those granted by our act, were authorized to acquire all the properties of a private corporation for purposes no different from those contemplated by the plan here proposed.

While the majority opinion recognizes that our public utility district statute contains provisions relative to the powers conferred, different from the statute pertaining to cities, and that we so held in *Carstens v. Public Utility Dist. No. 1,* 8 Wn. (2d) 136, 111 P. (2d) 583, and consequently what is said in the opinion relative to the powers of cities is important only in those situations where, as here, we are confronted with the question of what is the legislative intent, nevertheless the opinion states:

"The construction we have placed on the words 'without its limits' makes the powers of public utility districts entirely consistent with those of cities as they had been established in 1930, and consistent with the good faith and honesty of purpose of the sponsors of the public utility district law."

Let us examine the *Carstens* case, which is the only case wherein this court has passed directly upon the following words of the statute: "within or without its limits." The cited case was an action involving the power of the Lincoln county district to condemn and acquire electrical transmission and distribution lines within the limits of the district and in the two adjoining counties of Grant and Spokane. The opinion states:

"The districts created under this act are constituted municipal corporations. Rem. Rev. Stat., § 11606 [P.C. § 4498-12]. The general rule relative to this question is that municipal corporations may exercise their power of eminent domain beyond their boundaries if they are given the right to do so by legislative enactment."

The opinion then quotes:

" 'The power of the legislature to authorize a municipal corporation to acquire *lands beyond the municipal limits* and for that purpose to exercise the power of eminent domain cannot be disputed. It has long been recognized to exist where the use for which the property is taken is a proper and reasonable public use.' 3 Dillon, Municipal Corporations (5th ed.), 1626, § 1028.

" 'Likewise, a municipality cannot condemn lands within the state but outside its own corporate limits unless the power has been delegated by the legislature. However, it is well settled that the legislature may delegate such power.' 4 McQuillan Municipal Corporations (2d ed.), 406, § 1619."

Appellant *Weyerhaeuser Timber Company* places great stress on the case of *Spear v. Bremerton,* 90 Wash. 507, 156 Pac. 825, and it is referred to in the majority opinion. I mention it at this time in view of what is said in the *Carstens* case, *supra,* about the *Spear* case and *Farwell v. Seattle,* 43 Wash. 141, 86 Pac. 217. I quote from the *Carstens* case:

"The language of the cited cases reveals that this court has felt bound by the terms of the statutes which it construed, and has not attempted to lay down *any general rule* exclusive of the statutory provisions. A comparison of the statutes construed in those cases with the one we have before us, brings to light an *entirely different situation* than obtained in the cited cases. The present act is explicit in stating that public utility districts may acquire by condemnation *facilities for sale of power to persons outside* the districts, and *that the property so acquired* may be located *outside the districts.*" (Italics mine.)

I desire to call attention to the case of *Omaha v. Omaha Water Co.,* 218 U. S. 180, 54 L. Ed. 991, 30 S. Ct. 615, 48 L. R. A. (N.S.) 1084, cited in the *Carstens* case. I am impressed with the reasoning of the cited case, upon which the court based its decision that the city of Omaha could acquire the entire system of the Omaha Water Company, although the point from which water was taken by the existing water plant was outside the corporate limits of Omaha, and that the city could continue to furnish water

to the suburban towns which had been served by the water system. I quote from the cited case:

"As to the power of the city: The charter, § 27, Laws of Nebraska 1897, page 99, provided for the construction and maintenance of waterworks 'either within or without the corporate limits of the city.' This is said to only allow the location of pumping works or source of supply outside the city. The city does not therefore object to valuing the supply station and mains extending to the city as within the contemplated purchase. But it is said that the authority is limited to a distributing system wholly within the corporate limits. That the primary purpose was to supply the people of Omaha with water for public and private purposes is clear. [Just as in the instant case the primary purpose of the transaction here being considered was to supply the Skagit and affiliated districts with electric energy.] But does that forbid that those who live outside may not be also supplied from the main plant, and, if necessary, by such extensions, not inconsistent with the primary object, as may prove desirable as suburbs grow up around the city? . . .

"The review of the legislation touching the power of the city, and the conclusion of the Circuit Court of Appeals from that legislation, that the city had the power to acquire the system as it existed, and has the power to operate so much of it as is intended to supply the suburban towns adjacent which may be acquired, is full and satisfactory, and meets our approval. . . .

"The most weighty fact in this connection is, that the system was one single system, having a common source of supply and common main connections therewith. Its dismemberment is not to be thought of unless it is clear that the ordinance exercising the option is so plainly limited to the purchase of only so much of the distributing system as lay wholly within the corporate limits as to admit of no other meaning."

In the instant case, we are confronted with no question of public use, as we are in the *Carstens* case. I am unable to see how the *Carstens* case lends any support to the conclusions reached in the majority opinion. This court, in the *Carstens* case, went as far as it was required to go, under the facts, and held that the district had the power to condemn and acquire everything it sought to acquire;

both within and without the district. The opinion specifically limits the decision to the particular facts involved, and does not purport to announce any general rule.

Again I desire to state that it seems to me the language of the public utility act is so plain as to neither need nor warrant judicial construction. However, if it becomes necessary to find support for the construction here contended for by respondent, and which the language of the statute requires, to wit, that the statute authorizes all the acts to be done which are contemplated by this transaction, I am of the opinion ample authority can be found to support such construction, and that the case of *Central Lincoln Peoples' Utility Dist. v. Smith,* 170 Ore. 356, 133 P. (2d) 702, clearly is illustrative of what the courts have said relative to the powers of such utility districts.

In looking to outside authority to sustain a construction placed upon a constitutional provision or statute of this state, we are generally met with the statement that the state in which such decision was rendered does not have a statute or constitutional provision like our own. I will agree that this court does not have to accept as controlling any decision of a sister state, in the sense that this court must follow such a decision, but we may be in accord with the rules announced in such a decision, being influenced by the logic and reasoning of such case and the similarity of the facts. So I am of the opinion that the important words of the Oregon statute considered by the court in the cited case are so much like the words of our public utility districts act here under consideration that the rule announced in the cited case is applicable here. I quote from the opinion in the cited case:

"The legislature further provided in § 114-245 O.C.L.A., as amended by Chapter 287, Laws of Oregon for 1941, that utility districts have the power, among other things, 'to distribute, sell and/or otherwise dispose of water, waterpower and electric energy, *within or without the territory of such districts.*' (Italics ours.)

"Appellants concede that the utility district in question has the right, by virtue of the Constitution and the statute,

to sell and distribute electric energy beyond its boundaries, but contend that such sale and distribution can be only *incidental* [italics mine] to the major operations within the district.

"We are unable, under the law, to place such a restriction upon the operations of a utility district. The authority of a utility district to operate 'within or without' its boundaries is conferred upon it in plain, simple, unambiguous language. There is no need of construction when the language is reasonably susceptible of only one meaning. As to whether the welfare of the state is promoted by authorizing utility districts thus to extend their operations is a legislative, and not a judicial question."

The majority opinion proceeds to take the different sections of the public utility districts act and place its construction upon such sections. I am unable to agree that the particular words of the act, when considered alone or in connection with the entire act, can or should be limited to the extent they are limited by the majority opinion.

I can agree, as I have hereinbefore stated, that the primary purpose of the public utility districts act, in so far as the utility with which we are here dealing is concerned, is to furnish or make available to the inhabitants within any such district electric energy; but in addition to the power given for the purpose of obtaining the primary object, additional powers are expressly granted, which give to a district the right to operate outside its boundaries. When all the powers expressly granted to such a district, and those necessarily implied, are considered, I am of the opinion the districts here involved have the power to do all the acts, both inside and outside their respective boundaries, contemplated by the transaction here under consideration.

It is true that in the instant case the necessities of the situation require that these districts acquire more property and operate more extensively outside their boundaries than was required in the *Carstens* case, *supra*; but that fact, to my mind, cannot logically be said to be a basis for holding that the districts are exceeding the powers conferred in this case.

When this transaction is reduced to its essential elements, despite the many paper ramifications, it is nothing more than a contract of sale and purchase, in which Puget Sound is the vendor, and Skagit, acting on its own behalf and as agent for nine other public utility districts in which Puget Sound operates, is the vendee, with Skagit obligated to sell to each of the affiliated districts that portion of Puget Sound's distribution system located within the limits of each of such districts. The necessity which compelled the purchase of the entire system compelled the acquisition of the facilities of Puget Sound in the unorganized territory.

What is there in this transaction, when considered in the light of all the facts shown by the record, which requires this court to say that Skagit and the affiliated districts have exceeded the powers granted to them by the statute? Certainly there is no express limitation in the statute to prevent the carrying out of the plan here contemplated, and it is just as evident that this court has never placed such a limitation upon the powers of public utility districts as would prohibit the doing of the acts herein contemplated.

The only basis for the conclusion reached in the majority opinion is that the legislature did not *intend* to grant to public utility districts the power to operate outside their boundaries to the extent here contemplated. This conclusion, in my opinion, finds no support in the statute, nor in the only case decided by this court wherein the particular words of the statute with which we are concerned in this case were considered.

Who are the real objectors to this plan? The real parties objecting to this purchase are Weyerhaeuser Timber Company and the corporation counsel of the city of Seattle. Weyerhaeuser Timber Company, as a taxpayer within any one or more of the districts to be served, is not affected in so far as the payment of the bonds to be issued is concerned, for the bonds are not general obligation bonds, but revenue bonds only. The city of Seattle will be selling power produced at its own plants in competition with the sale of power by Skagit, but the city at the present time

is in the same position, for Puget Sound, under its franchise, now sells power to the inhabitants of the city of Seattle.

I recognize, of course, the contention that public utility districts are not required to pay taxes on their physical properties, but this raises a purely legislative, and not a judicial, question, and affords no legal basis for appellants' objection to the plan here proposed.

I can find no support for the conclusion reached by the majority opinion, and it seems to me the opinion places an arbitrary and unwarranted construction upon the public utility districts law, in order to arrive at the conclusion that Skagit and the affiliated districts do not have the power to do the acts herein contemplated.

May I say in conclusion that respondent, in its brief, discussed under separate headings every phase of this transaction and, in my opinion, justified every act which is to be performed therein, not upon any argument which may have been made for or against the act, but upon the language of the act itself, and ample authority from this and other states.

I desire merely to refer to the 1945 amendment, Laws of 1945, chapter 143, § 1 (Rem. Supp. 1945, § 11610 [P.P.C. § 833-11]), referred to in the majority opinion, which, the opinion admits, makes possible the resale of Puget Sound properties acquired by Skagit, without submitting the matter to a vote, but which, the opinion also states, throws no light on the question of the intention of the people in 1930. I can add nothing more to what I have said relative to the question of intent.

I am therefore of the opinion that the judgment of the trial court should be affirmed.

MALLERY, C. J., ROBINSON, and ABEL, JJ., concur with JEFFERS, J.

MALLERY, C. J. (dissenting)—I concur in the dissenting opinion of Judge Jeffers. He has fully set out the facts of the case as shown by the record, and has discussed the law upon the questions present here adequately and generally.

I desire to add an analysis of the majority opinion itself, referring only to such facts as are pertinent thereto.

The property here in question is an integrated system. Indeed, experience has shown that, for that reason, parts of it cannot be condemned separately without incurring excessive severance damages. Being aware of this and of the broad powers possessed by them, the public utility districts collectively adopted a co-ordinated plan that involved a purchase of the whole integrated system of the Puget Sound Power and Light Company. The excessive severance damages incident to condemnations would thus be avoided and the public utility districts thereby enabled to acquire more cheaply the parts of the integrated system appropriate to their several uses. Pursuant to regularly adopted resolutions, they selected the Skagit public utility district to act as their agent and entered into contracts by which their rights and obligations with regard to the system were fixed. In these contracts, the manner of acquiring their particular part of the system, the price, the method of payment and of integrated operation were agreed upon with particularity among themselves. With this plan, the Puget Sound Power and Light Company, which has always objected to being dismembered by piecemeal condemnations, voluntarily agreed. Thus both the seller and the buyers are satisfied with the bargain reached. No one contends that the price agreed upon is not a fair one or that the system can be operated efficiently or economically except as an integrated whole. The wisdom of the transaction is neither questioned nor in question. We are concerned solely with the power of the public utility districts to complete it.

The statutory language to be construed is clear and unambiguous. The required power is specifically given to the districts to do as they have planned.

The nature of the integrated system makes it necessary to sell electricity in the unorganized territory as an incident of its operation as such. Indeed, this cannot be avoided without dismembering and crippling the system. This does not in any way negative the primary purpose of the public utility districts as being that of serving their own people or

convert the plan into a scheme to go into the electric power business to sell to strangers only.

If this view of the facts be taken, then the lower court must be affirmed; for they fall squarely within the rule as announced by the majority opinion. To demonstrate that the facts as shown by the record in this case are those given by Judge Jeffers, I quote from the majority opinion:

"It may be conceded that this very ingenious and carefully devised plan gives to the various public utility districts concerned other than Skagit, the opportunity to acquire properties which they desire, at considerable savings over any awards that might be made if they were to endeavor to condemn such properties. It may also be conceded that Puget Sound's repeated objections to piecemeal acquisition are thereby obviated."

And again, the majority opinion says:

"(a)  The Cowlitz, Lewis, Pacific No. 2, Whatcom, Chelan, Kitsap, Mason No. 3, Snohomish, and Thurston County public utility districts are to acquire the distribution properties within their respective districts. . . . The terms of acquisition are set forth in contracts which were admitted as exhibits."

These quotations show the collective nature of the transaction accomplished through the agency of the Skagit district.

I quote the majority opinion for the rule laid down:

"The primary purpose of the power granted to a public utility district by subsection (d) of § 6, chapter 1, Laws of 1931 (Rem. Rev. Stat., § 11610(d)) is to furnish the district, and the inhabitants thereof, with electric current for all uses, and, as an incident thereto, it may furnish any other persons, including public and private corporations, within or without its limits, with such current for all uses."

The majority opinion, however, does not apply this rule to the facts in this case. Instead it adopts an imaginary hypothesis inconsistent with and repugnant to the facts as stated in the opinion itself.

It goes off on the assumption that the Skagit district is acquiring the entire system as if the other public utility districts did not exist, and thus by inference denies that, by

the terms of their contracts, the other districts will acquire the property within their territory and devote it to the primary purpose of serving their people. The minutely defined relationships between the Skagit district and the others are ignored as if there were no such contracts and agency. Their power to so contract and the fact of their having so contracted is disposed of in this manner, I quote:

"The intertie provision (of the statute) contemplates connection with the power plants or distribution systems of other public utility districts or municipal corporations. We do not understand that respondent is basing any claim of authority on this provision." (Parentheses mine.)

That the lone wolf hypothesis in the face of the facts to the contrary is the basis of the decision is made clear by this language of the majority opinion:

"The facilities here sought to be acquired are unreasonably large and entirely inappropriate for the accomplishment of the primary purpose of the Skagit district."

"It is impossible to envision any necessity for purchasing the Shuffleton, White river, Electron, Snoqualmie, and Georgetown plants for the purpose of serving that district (Skagit) or its inhabitants." (Parentheses mine.)

Continuing the lone wolf hypothesis, the majority opinion treats the acquisition of parts of the system by the other public utility districts as a dismemberment process on the part of the Skagit district. I quote:

"We quoted testimony to the effect that it is necessary for Skagit district to acquire the entire system, because it is integrated. The figures show that it is planned to disintegrate it immediately, by cutting off 31,365 customers . . . and by disposing of seven small generating plants."

In the same sentence that it recognizes Skagit's authority to convey to the several public utility districts the parts they desire, it denies its right to act for them in the original purchase. I quote:

"While this amendment gives authority to sell and convey certain kinds of property without the approval of the voters, it still does not give a public utility district (Skagit only) authority to acquire or operate a 'vast system operating in eighteen counties.'" (Parentheses mine.)

The only reason suggested by the majority opinion as to why Skagit will not be permitted to act for the districts in executing this plan is that it is a big plan. I quote:

"There is nothing . . . which indicates that the act was intended to give public utility districts the power to engage in business beyond their limits on the grandiose scale here contemplated."

"The right given . . . is subject to the limitation that the facilities acquired must not be unreasonably large or entirely inappropriate for the accomplishment of that primary purpose."

It fails to suggest how a little system, too small for the job, can be made to work. Everyone concedes that the system is not too large for its purpose. It is simply large. I quote:

"Recognizing all the values and advantages of the acquisition of this integrated system . . . Where does the Skagit district get power and authority to purchase 'this whole vast system extending over eighteen counties?' "

The majority opinion arrives at a legislative intent to prohibit adequate size of operating properties in the following manner, I quote:

"We have felt it desirable to examine the public utility district law in detail, that the legislative intent might be ascertained, not from the literal meaning of the words, 'within or without,' but from the text of the statute as a whole, interpreted in the light of the general object and purpose of the act, and its legislative history."

The majority opinion then proceeds to ignore the "literal meaning of the words" and arrives at its conclusion by having recourse to what it mistakenly treats as its legislative history. I quote:

"It seems, however, to have been generally agreed that additional legislation was necessary to permit the public utility districts . . . to co-operate in taking over the facilities of one of the major power companies in its entirety, where that company operated in several counties."

"The prevalence of such beliefs would indicate that those powers have not been regarded, heretofore, as clear, certain and unambiguous."

Back when no one supposed that the Puget Sound Power & Light Company would voluntarily sell all or any part of its system, condemnation appeared to be the only way open to acquisition by the public utility districts. It is perfectly obvious that severance damages could not be avoided when suits were brought in the several counties. Certainly, further legislation was needed for the condemnation process of acquisition to be freed from these excessive damages. The majority opinion admits that a voluntary sale of the system is different from separate condemnations. I quote:

"Merely because a plan is new or the methods proposed novel and unprecedented, is no reason to condemn it."

With severance damages obviated because of the voluntary sale of the system, it is manifest that legislation as to condemnations is not needed to avoid them.

The majority opinion impugns the good faith of the public utility districts and everyone concerned in the plan by ascribing to them only an incidental purpose of serving the electric needs of their districts, and arbitrarily holds that their primary purpose is to go into the electric business in territory beyond their borders. Neither the record nor common sense warrants such a holding.

The rule of the majority opinion applied to the true facts in this case requires an affirmance of the lower court.

I dissent.

JEFFERS, ROBINSON, and ABEL, JJ., also concur with MALLERY, C. J.

August 25, 1947. Petition for rehearing denied.