## Long v. Mayo et al.

(Decided Dec. 17, 1937.)

STITES & STITES for appellant.

WOODWARD, DAWSON & HOBSON, LEE WRIGHT BROWNING, HUBERT MEREDITH, Attorney General, and A. E. FUNK, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY JUDGE BAIRD—Affirming.

Dennis H. Long, citizen, resident and taxpayer of the city of Louisville, Jefferson county, Ky., owning personal and real property subject to taxation in the commonwealth of Kentucky of an assessed value of $2,500, instituted this action against John C. C. Mayo, Jr., the Midland & Atlantic Bridge Corporation and Robert Humphreys, commissioner of highways, wherein he sought to enjoin them from issuing and selling $885,000 par value of bridge revenue bonds and from

purchasing the capital stock of the bridge company with the proceeds. The case was submitted on a written stipulation of facts to the court. It was the judgment of the court that the commonwealth, acting by and through its highway department, was legally authorized to issue and sell $885,000 par value of bridge revenue bonds and to purchase with the proceeds the capital stock of the bridge company for the purpose set forth in the petition and written stipulation and denying the injunction sought. He prosecutes this appeal.

The stipulated facts are in substance as follows: Prior to the 8th day of August, 1935, the commonwealth of Kentucky, acting by and through the state highway commission of Kentucky, the predecessor of the department of highways, entered into negotiations with the Midland & Atlantic Bridge Corporation (hereinafter called the bridge company), to purchase from it the bridge across the Big Sandy river connecting the cities of Catlettsburg, Ky., and Kenova, W. Va., and proposed to finance the purchase of same by the issue and sale of bridge bonds, agreeable to the Acts 1928, c. 172, and the Acts 1930, c. 157, but were not able to reach an agreement, as desired, but did agree on a conveyance thereof to the commonwealth in consideration of a contract, whereby the bridge company was to receive the revenue therefrom to the 31st day of July, 1945.

In 1937, negotiations between the parties were renewed and it was found that the commonwealth could presently acquire the income from the bridge, as was originally desired and could free the public from the payment of tolls several years before 1945. At that time the department of highways had been assured by reputable brokers that if bridge revenue bonds bearing interest at 3 per cent. and payable out of the revenue from the bridge were sold, as contemplated, they would bid for the bonds not less than par; that is, make the bonds bring $885,000.

A written contract was entered into between the commonwealth and Mayo, acting for himself, and as trustee for the other stockholders of the bridge company; and the department of highways, acting by and through the commonwealth of Kentucky, by the terms of the contract, was given an option to purchase the remaining interest of the bridge company in the revenue for the bridge company for the sum of $1,000,-

000, or to purchase all of the stock of the bridge company for the sum of $885,000. The department of highways elected to acquire stock of the bridge company with the object, purpose, and intent of immediately dissolving the corporation, and thereby acquiring all interest of the bridge company in revenue from the said property; and the department of highways, acting for and on behalf of the commonwealth of Kentucky, does not propose to acquire, hold, or own said capital stock for any other purpose than to free the public using the bridge from paying toll. It was a part of the stipulated facts that on May 1, 1935, the bridge company entered into a contract with the Ohio Valley Bus Company, a corporation, engaged in the operation of passenger busses over the bridge, in consideration of a binding obligation from the Ohio Valley Electric Railway Company to refrain from converting its railway bridge across the Big Sandy river into a competitive vehicular and pedestrian bridge (which it was legally authorized to do), and which would have been in direct competition with the bridge company's bridge, the bridge company would pay to the railway company an amount equal to all of the annual tolls, which it might collect from the bus company, for the use of the bridge for passenger busses, retaining the sum of $300. At the same time, that the contract was made with the bridge company and Mayo, trustee, as heretofore set out, a written contract was entered into between the Ohio Valley Bus Company, the Ohio Valley Electric Railway Company, and the commonwealth of Kentucky, acting by and through the department of highways, wherein it was agreed that the commonwealth of Kentucky would carry out and be bound by the agreements and covenants set forth in the contract between the Ohio Valley Bus Company and the bridge corporation, with certain modifications shown therein.

The invalidity of the proposed transactions are attacked on three grounds: (1) The purchase of the bridge company's stock is expressly prohibited by section 177 of the Constitution of Kentucky; (2) the issue of bridge revenue bonds is by statute limited to the raising of money for the purchase, building, and operation of bridges, and since the commonwealth obtained a title to this particular bridge in 1935, the issue and sale of bonds is unauthorized.; and (3) that the assumption of the contract for bus service by the com-

monwealth at a less price than the toll charge to others renders the entire proceeding void and illegal.

Section 177 of the Constitution reads as follows:

"The credit of the Commonwealth shall not be given, pledged or loaned to any individual, company, corporation or association, municipality, or political subdivision of the state; nor shall the Commonwealth become an owner or stockholder in, nor make donation to, any company, association or corporation; nor shall the Commonwealth construct a railroad or other highway."

In Louisville Banking Company v. Eisenman, 94 Ky. 83, 21 S. W. 531, 1049, 14 Ky. Law Rep. 705, 19 L. R. A. 684, 42 Am. St. Rep. 335, we said:

"One person cannot organize a corporation * * * yet when a corporation has been created, * * * the purchase * * * of all the stock [by one person] does not destroy the existence, * * * but merely suspends its franchise until the stock may be transferred to others."

Or until the corporation is dissolved thus, the acquisition of all of this stock by the commonwealth would not cause the commonwealth to become a stockholder in the bridge company in the usual and ordinary sense. It could not do business through the agency of the corporation, because the existence of the corporation was suspended. The purpose of section 177 of the Constitution in prohibiting the commonwealth from owning stock in, or from making donations to, a corporation was to prohibit the commonwealth from entering into private business by becoming associated as a stockholder, or by being a partner, or a part owner in a private business venture. It was never intended by that section of the Constitution that the commonwealth could not acquire property for a public use. There can be no doubt that the acquisition of the bridge company's right to the revenue from bridge tolls is as much for a public purpose as was the purchase of the bridge itself, because it is stipulated that the object of the purchase of the stock is to free the bridge from toll charges sooner than could otherwise be done. This court has construed section 177, wherein it prohibits the commonwealth from giving, pledging, or loaning its credit to any individual, company, corporation, or association, municipality, or political subdivision of the state.

In the well-considered case of Hager v. Kentucky Children's Home Society, 119 Ky. 235, 83 S. W. 605, 608, 26 Ky. Law Rep. 1133, 67 L. R. A. 815, we held that section 177 did not prohibit the Legislature from appropriating money annually to the Kentucky Children's Home Society, a private corporation. In that case it was particularly pointed out that the section was not intended to prevent the state from making appropriations for public purposes, but was intended to prevent the state from becoming interested in private business purposes, even though private agencies were the direct recipients of such appropriation.

The main point in the instant case is, Was the purchase of the capital stock for the use and benefit of the public, and to relieve the public of toll charges? In the case of Hager v. Kentucky Children's Home Society, supra, on this point, the court said:

"These authorities clearly settle that the vital point in all such appropriations is whether the purpose is public; and that, if it is, it does not matter whether the agency through which it is dispensed is public or is not; that the appropriation is not made for the agency, but for the object which it serves; the test is in the end, not in the means."

The same principle is approved in Kentucky Live Stock Breeder's Ass'n v. Hager, 120 Ky. 125, 85 S. W. 738, 27 Ky. Law Rep. 518, 9 Ann. Cas. 50; Germann v. Farmers' Tobacco Warehouse Co., 260 Ky. 249, 84 S. W. (2d) 82.

In the Germann Case supra, section 177 of the Constitution was not directly involved, but section 544, Kentucky Statutes, was involved, which prohibits a corporation acquiring its own stock except for one purpose and then only to be held temporarily, it would seem, under a rule of statutory consideration often applied, that it could acquire it for no other purpose whatsoever. In the Germann Case the court approved the purchase of stock by a corporation, because in that event the corporation did not acquire or become the holder of the stock in the sense in which those terms are used in section 544 of the Statute. The stock purchased simply went out of existence with the resulting reduction in the capital stock of the company, so in construing section 177 of the Constitution, literally, we would come to the conclusion that in no event could the com-

monwealth purchase stock in a corporation, but when it is made apparent that, as is shown by the agreed stipulation herein, the purpose of the transaction was not that the commonwealth would become a partner or stockholder in a private business venture, but that the acquisition of the stock was for public purposes only; that the proceeds of the bonds sold would be used at once to pay the $885,000, and when paid the stock in the corporation would no longer exist and the bridge property would become the property of the commonwealth to be paid for by the revenue as collected in the form of tolls, until a sufficient amount had been received to satisfy the bonds.

In that respect the transaction does not violate the real object and purpose of section 177 of the Constitution.

Our attention is called to the cases of Bailey v. City of Tampa, 1926, 92 Fla. 1030, 111 So. 119; Sun Printing & Publishing Association v. The Mayor of City of New York, 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788; Thaanum v. Bynum Irrigation District, 72 Mont. 221, 232 P. 528; Murphy v. Dever, 320 Ill. 186, 150 N. E. 663, and People ex rel. Murphy v. Kelly, 76 N. Y. 475 which sustains this conclusion.

In the Murphy Case last cited it is thus stated that a bridge company was incorporated under the laws of New York to operate a bridge between New York and Brooklyn, and the two cities were authorized to subscribe for all the capital stock of the corporation and to acquire all the property of the bridge. The cities subscribed for a large part of the stock and began construction of the bridge. An amended act was passed authorizing the cities to own all or part of the stock and to leave the company in existence, but before any action was taken under the amendment article 8 section 11, of the New York Constitution was amended to provide that no city should thereafter give money or loan credit to or become the owner of stock in a corporation. Since this constitutional amendment prohibited stock subscriptions, the Legislature in 1875 passed an act providing for the completion and management of the bridge by trustees for the two cities, and for the acquisition of the stock of the bridge company by the two cities and the dissolution of the corporation and transfer of the bridge property to the two cities. Thereupon, the cities

purchased all the bridge company's stock and it was dissolved, and the construction of the bridge continued. Suit was instituted to enjoin the payment by the city of New York of $100,000 for the completion of the bridge on the ground that the act of 1875 violated the amendment to the Constitution prohibiting stock subscriptions to private corporations. The court held that the act was not in violation of amended section 11 of article 8 saying:

> "It was not the purpose or effect of the Act, to make the city of New York a stockholder in the bridge company, or to cause it to loan any money, or credit to such company. It was the purpose of the act to extinguish the company, and vest all its property in the two cities for a public purpose. The cities already owned most of the stock and property of the company, and a way was provided by which they could become the owners of the balance of the property. This was to be accomplished by voluntary agreement with the private stockholders, and the payment to them of the value of their stock, and in case they could not make such purchase, then such property was to be taken by the exercise of the right of eminent domain. The two cities could be authorized to take this bridge for a public purpose, as they could be, to take any other property for the same purpose, and the act provided the mode in which through the trustees they could do it. All the money they paid for stock or upon the debts of the company, was simply in furtherance of the purpose to vest the property of the bridge in the two cities, and it was not paid to aid the company or to make the cities stockholders therein. The effect was to be the dissolution of the company, and the transfer of its property."

By what is known as the Murphy Act (Acts 1928, c. 172) or the Clark Act (Acts 1930, c. 157) there is no prohibition in those acts forbidding this transaction by the department of highways. The broad grant of power to the department of highways authorizes it to purchase the rights of the bridge company to the revenue from the bridge without any specific statutory authorization. The Murphy Act, however, gives specific authority for this transaction. Section 2 of the act empowers the department of highways to purchase "any bridge, real estate or other property, real or personal, that in its

opinion may be useful or helpful in ultimately doing away with toll bridges on the State Primary System of Highways."

By the agreed stipulation, the purpose of the department in making the purchase of this stock and of issuing and selling these bonds is to secure the control of the bridge revenues, and free the bridge from tolls substantially sooner than if such stock was not purchased. Section 4 of that act authorized the issuance of such bonds to obtain funds with which to purchase a bridge.

It is urged that because the commonwealth already has a deed to the bridge from the company it may not issue the proposed bonds merely to acquire the revenue from the bridge. In the case of Estes v. State Highway Comm., 235 Ky. 86, 29 S. W. (2d) 583, there was involved the construction of a bridge across the Ohio river between Kentucky and Indiana, near Henderson, Ky. One-half was to be paid by Kentucky, the other by the state of Indiana. It was contended there that neither the Murphy Act, nor the Clark Act, authorized the issuance of bonds except to pay the costs of bridges, which should become the property of the commonwealth of Kentucky, and under the agreement between the two states, Kentucky would become the owner of only half of the bridge. In answer to that, we said, in substance, that the objection was without merit, and no such narrow construction should be given. The bridge became the property of Kentucky in proportion, that Kentucky paid for its construction.

It is insisted that the proposed bond issue is invalidated by the contract that the department of highways was to pay to the Ohio Valley Electric Railway Company until the bridge is free of toll, but not beyond July 1, 1945, a sum of money equal to the tolls collected annually, retaining the sum of $300, in consideration of the railway company agreeing not to convert its bridge across the Big Sandy river into a complete highway bridge. The validity or invalidity of that contract between the department of highways and the railway company does not in any way determine the power of the highway commission to issue and sell revenue bonds and to purchase the bridge company's right of the control of this bridge.

There is no express authority that we can find in

the Murphy Act or in the Clark Act, which authorizes the department of highways to make such an agreement. If this power exists, it necessarily must be implied from the powers expressly conferred upon the department of highways as agent of the commonwealth.

It is an accepted rule recognized often by this court that not only those powers expressly granted by the statute, but such powers as are necessarily or fairly implied in, or incident to, the accomplishment of the things which are expressly authorized to be done. Hunter v. City of Louisville, 208 Ky. 326, 270 S. W. 841; Barrow v. Bradley, 190 Ky. 480, 227 S. W. 1016. The Legislature has enacted various laws for the purpose of acquiring free roads and free bridges as soon as possible. State Highway Comm. v. Veiling, 230 Ky. 381, 19 S. W. (2d) 967.

In the case of State Highway Comm. v. King, 259 Ky. 414, 82 S. W. (2d) 443, this court held that the state highway commission had implied power under the Murphy Act and the Clark Act to issue bonds for the refunding of outstanding bridge revenue bonds; that the primary object and purpose of the Legislature in both of those enactments was the acquisition of bridges, which should be free of tolls at the earliest possible date. The agreement to pay the Ohio Valley Electric Railway Company a sum equal to a portion of the tolls, which the commonwealth will collect for the bus company's passenger busses crossing the bridge, is in furtherance of freeing such bridge of tolls as soon as possible. It is stipulated that the railway company could legally convert its bridge into a vehicular and pedestrian bridge and the competition from it would divert traffic from the commonwealth's bridge with a resulting loss of revenue. Consequently, it would be necessary to charge tolls over a longer period of time to make up for such loss in the absence of the agreement with the railway company. If the railway bridge was converted into a public toll bridge, every cent which it collected would have to be twice paid by the public before a free bridge could be obtained.

The agreement of the department of highways to pay the railway company a part of the tolls, which it will collect from the bus company, in consideration of the railway company's refraining from competing with the commonwealth, may be fairly said to be a reasonable means adopted within the authorized discretion of

the deparmtent of highways to free the bridge in question of tolls at the earliest possible date by removing competition.

In Reconstruction Finance Corporation v. City of Richmond, 249 Ky. 787, 63 S. W. (2d) 631, this court held that express authority for a city to provide gas service to the inhabitants thereof did by implication authorize the city to issue bonds payable solely from the revenue to be derived from such system for the purpose of acquiring and improving the same.

The object and purpose of the contract was to free the bridges of tolls as hastily as possible.

In the case of State Highway Comm. v. Veiling, 230 Ky. 381, 19 S. W. (2d) 967, this court held that the state highway commission was authorized to pay out of the general road fund the cost of maintaining and insuring toll bridges on the ground that such payments would hasten the day when such bridges would be free of tolls and was, therefore, permitted by implication in furtherance of the general purpose to free such bridges of tolls as soon as possible.

With that principle in mind, the department of highways has the implied power to pay the railway company the various amounts, which would be due it under the terms of the agreement stipulated as of date October 13, 1937. The only purpose of both the Murphy and the Clark Acts was to abolish toll bridges and establish instead bridges that are free of toll. The agreement attacked here by appellant is but a logical step for the accomplishment of that purpose.

Wherefore, the judgment is affirmed.

Whole court sitting.