142 So.2d 79 (1962)
The STATE of Florida, Appellant,
v.
DADE COUNTY, a Political Subdivision of the State of Florida, Appellee.
Carlos EDWARDS et al., Appellants,
v.
DADE COUNTY et al., Appellees.
CITY OF MIAMI, Appellant,
v.
DADE COUNTY, a Political Subdivision of the State of Florida, Appellee.
Nos. 31558, 31558-A, 31558-B.
Supreme Court of Florida.
June 8, 1962.
*82 Richard E. Gerstein and John C. Wynn, Miami, for State of Florida.
Anderson & Nadeau, Miami, for Carlos Edwards et al.
Robert D. Zahner, Coconut Grove and Jack R. Rice, Jr., Miami, for City of Miami.
Darrey A. Davis, Miami, for Dade County.
Scott, McCarthy, Preston & Steel and Paul R. Scott, Miami, for W.D. Pawley.
DREW, Justice.
A petition to validate nine million dollars of transit system revenue bonds sought to be issued by Dade County (hereafter called the County) was consolidated with a suit for declaratory decree filed by Carlos Edwards and others as taxpayers and citizens of Dade County and certain municipalities therein, questioning the validity of an agreement between the County and W.D. Pawley for the purchase by the County of certain transit companies. Final decrees were entered in each suit. In the bond validation proceeding the final decree upheld the power of the County under the Florida Constitution and the Home Rule Charter to establish and develop a unified mass transit system under county ownership; upheld the power of the County to create and establish a Metropolitan Dade County Transit Authority as a governmental unit, agency or instrumentality of the County; found that the transit authority had recommended to the Board of County Commissioners (hereafter called the Board) as the best solution for the development of a unified mass transit system for said County, at a cost commensurate with the value received, the acquisition of the four transit companies owned by W.D. Pawley free and clear of all liens and encumbrances; found and determined that the Board had approved the recommendations of the transit authority; validated and approved the contracts between Pawley and the County for the purchase of said transit systems at the price of $7,705,274; decreed that the Board had the power to adopt and had adopted an ordinance authorizing the issue of $9,000,000 of transit revenue bonds of the County for the purpose of providing funds for the purchase of said system and for constructing a central garage and office building and providing initial working capital; found that in the ordinance authorizing the issuance of said bonds provision was duly and legally made for the execution of a trust agreement to secure the payment thereof; found and determined that rates, fares and charges for the services and facilities furnished would be sufficient at all times to pay the cost of operating and maintaining the transit system and the principal and interest of the revenue bonds and to create and maintain reserves for such purposes. The decree of validation adjudicated that the Board was empowered to operate a public transportation system and to issue revenue bonds in the manner above mentioned and, subject to such limitations as may be provided by law, to exercise all powers and privileges granted to municipalities as well as to exercise all powers not prohibited by the Constitution or the Home Rule Charter of Dade County; decreed that the County was fully authorized to issue said $9,000,000 of transit revenue bonds and that such Board was fully authorized to create the transit authority hereinabove referred to and that the ordinance creating such authority was duly and lawfully adopted; decreed that the agreement of *83 May 17, 1961 for the sale and purchase of the systems between W.D. Pawley and the County was properly entered into and constituted a valid, binding and effective agreement between the parties; decreed that the ordinance authorizing the issuance of said bonds and the delivery of the trust agreement was properly adopted; validated and confirmed all of the terms, conditions, covenants and provisions in said ordinance and trust agreement. It was specifically adjudged and decreed that none of said revenue bonds to be issued would constitute a debt of the County, that the faith and credit of the County was not pledged to the payment thereof, and that the issuance of such revenue bonds would not obligate the County to levy or pledge any taxes whatever. The court further decreed that the issuance of said revenue bonds did not violate the provisions of Section 6, Article 9 of the Florida Constitution, F.S.A.; that the covenants contained in the ordinance authorizing the issuance of said bonds and the trust agreement requiring the County to fix and collect rates, fares and charges sufficient to pay the cost of operating said system as well as the principal and interest on the revenue bonds and to maintain reserves for such purpose was a valid and binding covenant; and that no laws of this state impose any power on the Florida Railroad and Public Utilities Commission with respect to the approval of the fixing and collecting of such charges, rates or fares. The court decreed that the purchase agreements between Pawley and the County were valid and that no laws of this state conferred any jurisdiction on the Florida Railroad and Public Utilities Commission with reference to the transfer of the said transit system to the County. The court further specified that the provisions of said sale and purchase agreement with respect to the manner of acquisition of said systems did not violate the provisions of Section 10 of Article 9 of the Florida Constitution, and that the County was authorized to issue and sell its revenue bonds in exchange for the capital stock of said transit companies in accordance with the terms of said agreements. Finally the court decreed that the ownership and operation of said transit system by the County did not unlawfully impair the rights of the City of Miami, the City of Miami Beach or the City of South Miami under existing franchise agreements with certain of said transit companies or unlawfully deprive said municipalities and the citizens and taxpayers of the revenues under such franchise agreements; that the County will have no obligation to said municipalities under such agreements upon the acquisition of said transportation systems. Based upon such findings and adjudications, the trial court validated and confirmed said bonds in the principal sum of $9,000,000 maturing at the times and in the manner therein prescribed and bearing interest not to exceed the rates therein specified.
A supplemental decree entered February 2, 1962 recited that the decree of validation summarized above determined and decided most of the questions relating to the consolidated proceedings and that it was the purpose of such supplemental decree to determine all remaining questions presented in said cases. In addition, the supplemental decree contained the recitation that, since all of the issues had been fully heard and considered by the court in the consolidated cases, and the court being of the opinion that with the entry of the supplemental decree all of the issues in both cases had been determined, it should include in such decree a provision enjoining any person or party from commencing any further action relating to any and all matters adjudicated in the consolidated causes consistent with the laws of this state. Whereupon, the court found that it had jurisdiction of the parties and the subject matter, that "there is no franchise tax due the City of Miami, Florida by the defendant Miami Transit Company," that "the sale of the capital shares of the defendant companies in Dade County will not create any indebtedness, obligation or liability by Miami Transit Company to the City of Miami for franchise tax," and that "upon the acquisition by Dade County *84 of the capital shares of the defendant companies the franchise of said companies terminates." Thereupon the court decreed that the complaint of Carlos Edwards and others heretofore referred to and the cross-complaint of the City of Miami seeking a recovery of deficiencies in franchise taxes from the Miami Transit Company be dismissed and that all persons and parties affected by said decrees be enjoined and restrained from commencing any action at law or in equity seeking to adjudicate any of the questions of law or fact determined in said causes.
From the two decrees summarized above five separate appeals have been taken by interested parties, one by the State of Florida and four by the City of Miami and the bus operators' union. Assignments of error are filed in all appeals so taken in which there are enumerated a total of fifty-four[1] alleged errors, and nineteen points are argued by the various parties to these causes. Inasmuch, however, as many assignments of error and several of the points argued are identical or sufficiently related to present substantially the same point, we deem it unnecessary to detail what we consider to be the pertinent points involved or designate the particular party or parties urging them.
We have examined the voluminous records and extensive and ably prepared briefs in these consolidated cases and have carefully considered all nineteen points argued by the respective parties. We shall discuss and dispose of those we deem essential.
The basic and primary point for consideration is whether the County is authorized and empowered under the provisions of the Constitution, Home Rule Charter and general laws to acquire by purchase all of the capital stock of private corporations owning bus transportation systems in the County and to issue revenue bonds payable solely from the earnings of such bus system to pay the cost of acquiring the same and making improvements thereto and in connection therewith to create a transit authority for the purpose of operating such system under policies fixed by the Board of County Commissioners.
"Article VIII, Section 11 of the Florida Constitution, known as the Dade County Home Rule Amendment, provides:
"(1) The electors of Dade County, Florida, are granted power to adopt, revise, and amend from time to time a home rule charter of government for Dade County, Florida, under which the Board of County Commissioners of Dade County shall be the governing body. This charter:
* * * * * *
"(b) May grant full power and authority to the Board of County Commissioners of Dade County to pass ordinances relating to the affairs, property and government of Dade County * * and to do everything necessary to carry on a central metropolitan government in Dade County.
* * * * * *
"(d) May provide a method by which any and all the functions or powers of any municipal corporation or other governmental unit in Dade County may be transferred to the Board of County Commissioners of Dade County.
"(e) May provide a method for establishing new municipal corporations, special taxing districts, and other governmental units in Dade County from time to time and provide for their government and prescribe their jurisdiction and powers."
The Home Rule Charter adopted pursuant to the constitutional amendment contains the following:
"Sec. 1.01. Powers.

*85 "(A) The Board of County Commissioners shall be the legislative and the governing body of the county and shall have the power to carry on a central metropolitan government. This power shall include but shall not be restricted to the power to:
* * * * * *
"(2) Provide and operate * * * public transportation systems.
* * * * * *
"(14) Regulate, control, take over, and grant franchises to, or itself operate * * * public transportation systems. * * *
* * * * * *
"(21) Exercise all powers and privileges granted to municipalities * * * and all powers not prohibited by the Constitution or by this Charter.
* * * * * *
"(23) Perform any other acts consistent with law which are required by this Charter or which are in the common interest of the people of the county.
* * * * * *
"(B) * * * All of these powers may be exercised in the incorporated and unincorporated areas. * * *
* * * * * *
"Sec. 5.07. Franchise and utility taxes.
"Revenues realized from franchise and utility taxes imposed by municipalities shall belong to municipalities.
* * * * * *
"Sec. 8.04. Supremacy Clause.
"(A) This Charter and the ordinances adopted hereunder shall in cases of conflict supersede all municipal charters and ordinances. * * *
"Sec. 8.05. Existing franchises, contracts, and licenses.
"All lawful franchises, contracts, and licenses in force on the effective date of this Charter shall continue in effect until terminated or modified in accordance with their terms or in the manner provided by law or this Charter."
Under the foregoing provisions the Board exercises the powers formerly vested in the state legislature with respect to the affairs, property and government of Dade County and all the municipalities within its territorial limits.[2] In the exercise of such power the Board, of course, may not transgress any of the provisions of the Constitution and general laws of this state except in those instances where the power to do so is expressly authorized by the provisions of that portion of the Florida Constitution designated as the Dade County Home Rule Amendment.[3]
An adequate public transportation system, according to the record in this case and as a matter of common knowledge, is necessary and essential in the development, improvement and growth of great metropolitan areas such as that embraced within the limits of the County. One of the obvious purposes of metropolitan government and a principle inherently embodied in the constitutional amendment and the Home Rule Charter is the development of public services and utilities having county-wide application and uniform operation. We have heretofore held that county ordinances adopted under the amendment and charter supersede municipal charters and ordinances when in conflict therewith except where the charter specifically provides otherwise.[4] In the Cowart case cited in *86 the footnote we were dealing with a Dade County traffic ordinance but the rationale and holding in that case squarely sets the pattern presented here with reference to whether or not the County has power to purchase and operate a unified county-wide transportation system and to set the machinery in motion and to provide the necessary personnel to effectively carry such plan into effect. Moreover this Court, in affirming a decree validating revenue bonds proposed to be issued to finance the purchase of four privately owned water works and sewage disposal systems and constructing extensions and improvements to the same, has said such activities were not prohibited by the Constitution or Charter or other applicable laws but, on the contrary, were expressly authorized by the same.[5] In determining that the County was authorized to purchase and operate those systems and provide for extensions and improvements to the same, we set at rest many of the questions involved here in purchasing and operating another type of public utility, viz.: a county-wide transportation system.
As to the next facet of the same questions, viz.: the power of the Board to create a transit authority, we think little need be said. It is quite obvious that an undertaking of such magnitude would require not only a preliminary study by responsible representatives of the Board but constant supervision after such acquisition. The pertinent portion of the Constitution[6] provides that the Home Rule Charter may provide a method for establishing governmental units in Dade County from time to time and may provide for and prescribe their jurisdiction and powers. Pursuant to such constitutional provision the Home Rule Charter[7] authorizes the Board to adopt such ordinances and resolutions as may be required in the exercise of its powers and to perform any other acts consistent with law which are required by the Charter and are in the common interest of the people of the County. We find no error in the action of the trial court approving the creation of the Metropolitan Dade County Transit Authority as a governmental agency of the County and the power granted it under the ordinance by which it was created.
The next point involves the question of whether the acquisition by the County of the transportation systems involved will impair any legal rights of the municipalities under existing municipal franchises which such municipalities had theretofore granted the owners. Under the Constitution of this state[8] plenary power exists in the legislature over all municipalities of this state. This power, formerly residing in the legislature insofar as municipal corporations of Dade County are concerned, as limited by the Home Rule Charter, is now vested in the Board of County Commissioners and may be exercised by said Board to the extent that it does not conflict with the provisions of the Constitution and general laws affecting all municipalities, except in such instances as may be expressly authorized by the constitutional amendment granting home rule to the County. The franchises involved in these proceedings were granted by the affected municipalities pursuant to express legislative authority.
Appellant City of Miami contends that, having granted a franchise to Miami Transit Company for a period of twenty *87 years and said franchise being in force at the time of the acquisition of all of the stock of said Miami Transit Company by the County, such County cannot lawfully acquire and operate such transit system unless the County assumes and agrees to pay the franchise taxes imposed by the existing franchise upon such public utility. The City supports such contention with the argument that its rights are protected against impairment by the Fourteenth Amendment to the United States Constitution and Section 17 of the Declaration of Rights of the Florida Constitution. In addition to the fact that upon taking over the public transportation systems involved Dade County will step into the shoes of the various municipalities granting such franchises the contention of the City of Miami rests upon the erroneous premise that franchise agreements are contractual arrangements protected under the constitutional provisions above alluded to. Neither the municipality nor any taxpayer thereof has any vested right in a franchise granted by the City.[9] The legislature (in this instance the Board of County Commissioners) having the power to authorize the granting of franchises is also vested with the power of withdrawing such authority from an affected municipality. Such rights are basically political rights and such privileges are basically political privileges. Such rights and privileges are not protected by the constitutional provisions mentioned, which have reference only to those contracts which involve property rights.[10] It would be unrealistic to entertain the idea that the metropolitan government of Dade County, having the power, as we have held, to control and regulate traffic on all of the highways in the County and vested with the power under the Constitution and Home Rule Charter to operate utilities and furnish services and perform functions "that are susceptible to, and would be most effectively carried on under, a uniform plan of regulation applicable to the county as a whole,"[11] would be required to obtain permission from the City of Miami to operate such transportation facilities upon the public streets and pay for the privilege thereof. The franchise ceases to exist upon the acquisition of the system by the County.
While presented under another point, we will here discuss the related question of whether appellant City of Miami was entitled to recover of Miami Transit Company a deficiency in franchise tax amounting to $852,085.74 as of November 1, 1961, a point determined adversely to the City in the supplemental final decree by the holding of the trial court "there is no franchise tax due the City of Miami, Florida by the defendant Miami Transit Company."[12] In essence the City of Miami contends and the Transit Company agrees that as of November 1, 1961 there was a deficiency in franchise taxes of the above figure. The franchise provides that the franchise tax of 5% shall be paid the City of Miami only after certain fixed charges, including among others, a designated rate of return to the company, federal taxes and other items are deducted from the gross annual income of the company. If profits remain thereafter, such tax shall be paid therefrom but not otherwise. The franchise further contains the provision that such deficiencies in taxes may be accumulated from year to year and in the event sufficient profits arise in the future, as defined by the franchise either from operations or the sale of assets or both, in an amount sufficient to pay said deficiency, such franchise tax shall thereupon *88 be immediately payable. The City contends here that the sale involved is one of assets and not of stock, that such sale results in a profit sufficient to render the deficiency payable, and that it therefore should be awarded a judgment in this amount.
The trial judge disagreed with the City. We agree with the trial judge. In the first place, the Miami Transit Company is not a party to these proceedings. In the second place, the sale involved is not a sale of assets in the sense used in the franchise agreement but one of common stock of the companies involved. The sale is between Pawley, the owner, of all the common stock of the companies involved and the County, hence there is no profit in the transaction to which the deficiency may attach. Moreover, as we have heretofore held, the franchise relationship terminates upon the acquisition of the stock by the County and the assumption of operations of the transportation system by it, which necessarily terminates the possibility of such tax ever becoming due by reason of operating profits under the franchise.
We now turn to the question of whether the sale of all of the common stock of these transportation systems is a sale condemned by that provision of the Florida Constitution which prohibits the County from becoming a stockholder in any company, association or corporation.[13]
As a preliminary to the discussion of this question  and it needs little discussion because of prior decisions of this Court  it is conceded that all of the stock of the four systems is owned by the seller, W.D. Pawley. Moreover, the agreement of sale and purchase provides that the companies shall be delivered to the County free and clear of all encumbrances and provides for indemnity by Pawley for any undisclosed obligations of the companies prior to the hour of sale. It is further conceded and the agreement provides that the purchase of all of the common stock of these companies by the County is made for the purpose of acquiring said companies in their entirety including all of their assets, and that promptly upon the closing of the transaction the companies will be dissolved and the County will then become the owner of the transportation system and all of its physical properties. The identical situation has been considered and approved by this Court in several cases.[14] The Constitution prohibits the state or any of the subdivisions thereof or political entities within it becoming a stockholder with others in any corporation, company or association. The manner here used to acquire this company is not condemned by the Constitution, either the spirit or letter thereof. Moreover, many other states having similar constitutional provisions have placed their stamp of approval upon the acquisition of properties to be devoted to public purposes in this manner.[15]
*89 Federal taxes could well constitute a major factor in determining the price at which such public service corporations could be purchased. Such taxes enter into and become a vital part of business transactions in this age and play an important part in determining the ultimate price which the purchaser must pay, because the manner in which such transaction is handled can well result in legitimate tax savings to the seller. Whether this is a factor here we do not attempt to say, but if it is the benefits derived from the mechanics used in this transaction could inure not only to the seller but to Dade County and hence to the general public. We find no objection to the mechanics employed for vesting the title to the ownership of these systems in the County.
The State of Florida presents the question of whether the provisions of the purchase agreement for transfer of these transit systems is valid and binding without the prior approval of the Florida Railroad and Public Utilities Commission. It is further urged by the state that the provision of the ordinance authorizing the issuance of the revenue bonds and the trust agreement authorized thereby are invalid and void because the fixing and collecting of fares by the transit authority is not made subject to the approval of the Florida Railroad and Public Utilities Commission. We agree with neither contention. The Florida Railroad and Public Utilities Commission has not been delegated  nor in our opinion did the legislature intend that it should have  jurisdiction over publicly owned and operated transportation systems. As we have heretofore stated, the Home Rule Charter authorizes the Board to provide and operate this public transportation system and vests in it "all implied powers necessary and proper to carry out such powers." This includes the power to regulate the operation of a public transportation system and to fix fares and routes of service. This being true, the Railroad and Public Utilities Commission has no jurisdiction over this transportation system operated by Dade County either under Section 323, Florida Statutes, F.S.A., or otherwise.[16]
The last and final point we find necessary to discuss and which has been strongly urged upon us in the brief and the oral arguments of Carlos Edwards, et al., relates principally to the question of the propriety of purchasing and the feasibility of successfully operating this transportation system for the County. The large and comprehensive record in this cause deals primarily with evidence upon the feasibility of the project and whether or not, if the project is feasible in the eyes of the law, the price for which it is being purchased is just and reasonable. These questions, on their face, are primarily political and lie within an area which courts should enter only with great caution. Whether it is a facet of socialism for public bodies to purchase and operate transportation systems is not a decision for this Court to render. Ours is the task of determining whether this public body has the power under the law to acquire and operate this system, and whether it has complied with the law in the methods and means of acquisition it has used and in the covenants and stipulations it has entered into with the owners and others affected including the bondholders.
There is a wide variance in the testimony of the expert witnesses as to the feasibility of the project. The experts testifying on behalf of the County, men who according to the record are amply qualified, testified that the price to be paid was reasonable and that over a projected period of time the profits from the system would be sufficient to pay off and retire the cost of acquisition and operation without resort to other income. On the contrary, the principal witness for appellants testified that the project was not feasible and that it would be necessary within a relatively short period *90 of time for the County to fall back upon other sources of revenue to sustain the operation of the system. The testimony of the County's experts as to feasibility and that of appellants' expert varied seven and a half million dollars over a period of years. The testimony in this case was heard by the able trial judge who, upon due consideration, found that the plan was feasible and, from the evidence before him, the operations would be sufficient to retire the principal and interest of the validated obligations at the time and in the manner provided in the resolution and trust agreement from the revenues without resort to other taxation. It may well be that the trial judge was influenced by the experience in similar undertakings of the witnesses who testified before him and, so far as the expert of the appellants is concerned, may have been impressed by the fact that appellants' witness in answer to a question stated "that he was not keen on any publicly owned transit companies." In answer to a direct question he stated "I could say it [meaning public ownership of transportation companies] is an evil to avoid as long as one could." In any event, these are considerations peculiarly within the province of the trial court to determine. Our independent appraisal of the evidence completely supports the findings of the trial judge.
Whether the acquisition of this system is wise from a political or business standpoint is a question upon which this Court has no authority to substitute its judgment for that of the Board. In the last Turnpike case[17] we had occasion to consider a similar argument with reference to the wisdom of extending the Florida Turnpike and, in that case, we repeated an observation made by Mr. Justice Thomas in the opinion in the first Turnpike case[18] to the effect that we were not concerned with the policy inherent in acts of the legislature concerning the wisdom of provisions in projects of this kind because such matters lie exclusively within its province. And we again pointed out, as was noted by Mr. Justice Thomas in the first case, that our responsibility was to review the order which validated the bonds and to determine whether the issuing body had the power to act and exercised that power in a lawful manner. In this case we answer both questions in the affirmative.
We have given careful consideration to all of the remaining points presented and argued in the briefs of the parties  including the contention that an election of the free-holders of the County was required by Section 6 of Article IX of the Florida Constitution[19]  and find each to be without merit.
Affirmed.
ROBERTS, C.J., and TERRELL, THOMAS and SEBRING (Ret.), JJ., concur.
NOTES
[1] Although appellant's brief and the face of the record show this figure, there appears upon analysis to be a duplication of the twelve assignments by the individual appellants resulting from their consolidation of errors assigned in the two causes.
[2] Chase v. Cowart, Fla. 1958, 102 So.2d 147.
[3] Dade County v. Young Democratic Club of Dade County, Fla. 1958, 104 So.2d 636.
[4] Miami Shores Village v. Cowart, Fla. 1958, 108 So.2d 468.
[5] State v. Dade County, Fla. 1961, 127 So.2d 881. See also Chapter 159, Florida Statutes, F.S.A., which expressly authorizes any board of county commissioners of any county in this state to acquire self-liquidating projects and to issue revenue bonds to pay the cost thereof and to fix and collect rates, tolls and charges on the same and to acquire such property as may be deemed necessary to the successful operation of any such project and to make contracts with reference thereto.
[6] Article VIII, Section 11(1) (e).
[7] Section 1.01(A) (2).
[8] Article VIII, Section 8, Florida Constitution.
[9] 16 C.J.S. Constitutional Law § 244, p. 1225.
[10] State v. City of Miami, 1931, 103 Fla. 54, 137 So. 261; Shelby v. City of Pensacola. 1933, 112 Fla. 584, 151 So. 53; State ex rel. Green v. City of Pensacola, Fla. 1961, 126 So.2d 566. As to the federal constitutional aspect presented, see Laramie County v. Albany, 92 U.S. 307, 311, 23 L.Ed. 552.
[11] Miami Shores Village v. Cowart, footnote 4, supra.
[12] See summarization of such supplemental decree in the introductory paragraphs of this opinion.
[13] Article IX, Section 10, Florida Constitution.

"Section 10. Credit of state not to be pledged or loaned.  The credit of the State shall not be pledged or loaned to any individual, company, corporation or association; nor shall the State become a joint owner or stock-holder in any company, association or corporation. The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual."
[14] Brautigam v. White, Fla. 1953, 64 So.2d 781; State v. City of Daytona Beach, Fla. 1954, 69 So.2d 658; State v. City of Key West, 153 Fla. 226, 14 So.2d 707.
[15] City of Springfield v. Monday, 1945, 353 Mo. 981, 185 S.W.2d 788; People ex rel. Murphy v. Kelly, 76 N.Y. 475; Long v. Mayo, 271 Ky. 192, 111 S.W.2d 633; Cawood v. Coleman, 294 Ky. 858, 172 S.W.2d 548; State ex rel. Johnson v. Consumers Public Power Dist., 143 Neb. 753, 10 N.W.2d 784, 152 A.L.R. 480. See also annotation beginning 152 A.L.R. 512.
[16] City of St. Petersburg v. Carter et al., Fla. 1949, 39 So.2d 804. Cf. State v. Dade County, note 5, supra. The Florida Railroad and Public Utilities Commission is not a party to any of these proceedings and has taken no position whatever with reference to this question.
[17] State v. Florida State Turnpike Authority (Fla. 1961), 134 So.2d 12.
[18] The State of Florida v. Florida State Turnpike Authority, Fla. 1955, 80 So.2d 337.
[19] "SECTION 6. Bonds; state, county, municipal.  The Legislature shall have power to provide for issuing State bonds only for the purpose of repelling invasion or suppressing insurrection, and the Counties, Districts, or Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such Counties, Districts, or Municipalities shall participate, to be held in the manner to be prescribed by law; but the provisions of this act shall not apply to the refunding of bonds issued exclusively for the purpose of refunding of the bonds or the interest thereon of such Counties, Districts, or Municipalities."

These bonds, being payable solely from the revenue to be derived from the facility, are, under numerous decisions of this Court, not affected by this provision of the Constitution. See collation of cases and comments in 26 Fla.Jur.Public Securities & Obligations, para. 68, et seq.